(No. 41472.—

THE PEOPLE *ex rel.* Roy Robert Edwards, Appellee, *vs.* ALVIN (Elvin) LIVINGSTON, Appellant.

*Opinion filed March 27, 1969.*

JOE B. McDADE, of Peoria, for appellant.

CLEVENGER AND METZLER, of Pekin, (ROBERT L. METZLER, of counsel,) for appellee.

Mr. JUSTICE WARD delivered the opinion of the court:

Roy Robert Edwards on September 12, 1967, filed a petition for a writ of *habeas corpus* in the circuit court of Peoria County seeking custody of Roy Elvin Edwards, his 12-year-old son, from Alvin (Elvin) Livingston, the child's maternal grandfather. The petition set forth that the appellee, Roy Robert Edwards, was the father of Roy Elvin Edwards and that the appellee and Marie Edwards, the mother of Roy Elvin Edwards, had been divorced on April 21, 1958, and that custody of Roy Elvin Edwards had been awarded to Marie Edwards. The appellee stated that Marie Edwards had died on August 7, 1967, (the actual date of death appears to have been July 27, 1967) and that the appellee, being the natural father of the child, was entitled, therefore, to the custody of Roy Elvin Edwards. The appellant, Alvin Livingston, filed a return on September 22, 1967, which denied that the appellee was entitled to custody of the child, alleged that the appellee was not a fit person to have the care and custody of the child, claimed that he had forfeited his right to custody of the child by abandoning him and declared that the best interest of the child required that he remain in the care and custody of the appellant. After hearing evidence, the trial court found the appellee to be a fit person to have the care and custody of Roy Elvin Edwards and concluded that under

the law and in the best interest of the child that custody should be awarded to the appellee. Pursuant to this, custody of young Roy was transferred to his natural father at the close of the academic year 1967-1968. The appellant has appealed here under our Rule 302(a)(3). Ill. Rev. Stat. 1967, ch. 110A, par. 302(a)(3).

The appellee, Roy Robert Edwards, and Marie Edwards were married in 1954. They lived together in the home of the appellant, Mrs. Edwards' father, until August 1956. Roy Elvin Edwards, the only child of the marriage, was born in 1955. Apparently, during this time that the appellee and his wife lived with her father he was not steadily employed and, on August 15, 1956, he moved from the appellant's home leaving his wife and young Roy, then 17 months of age. The appellee admitted that during the period he and his wife lived with the appellant no rent was paid by them. The appellant claimed, that for about a year before the appellee moved away from his wife and child, he contributed only nominally to the support of his wife and young Roy, and he stated that, after two or three months in which the appellee contributed nothing, the appellant told him either to obtain a job to help to pay expenses or leave the house. The appellee moved.

After leaving the appellant's home on August 15, 1956, the appellee did not communicate with his wife until 1958 when he approached her concerning a divorce. On April 21, 1958, a decree of divorce was entered granting Mrs. Edwards a divorce on the grounds of desertion and adultery and providing for $10 a week as a child-support award. The appellee never did make any child-support payments either before or after the divorce decree. Following the divorce in 1958, the appellee did not visit young Roy and, except for a Christmas card which he sent to his son in 1960, which was returned to the appellee, he did not otherwise communicate with the child. The appellee saw his son for the first time, following the separation and divorce in 1958, at his former

wife's funeral in July of 1967, when he was introduced to young Roy by the appellant.

At the hearing in the trial court, the appellee testified that at no time did he consult an attorney regarding his right to visit his child and that no one had told him he could not see the child. He stated that prior to the death of the child's mother he believed that it would be best to leave the child with his mother, but after her death, he considered that the child should be with him. He further testified that he was a stranger to the boy and that he did not know anything that would reflect unfavorably on the appellant's ability to provide for the child. He contended that when he attempted to visit his son after the death of the mother, the appellant told him the boy was not at home and asked him to leave and not return.

The appellee stated that he had been steadily employed on a full-time basis at a foundry since 1960 and before that time he had held various odd jobs. The appellee related that in 1958 he had pleaded guilty to a charge of contributing to the delinquency of a minor and had been sentenced to 90 days in jail. He testified that the charge had been based on a claim that he had gotten a 16-year-old girl pregnant. The girl, whom he had met at the appellant's home, was the niece of Marie, then his wife. He stated that he had never had any other difficulty with the law and had been in no financial difficulty since 1960.

The appellee and his present wife, Verna Jean Edwards, were married in 1960. He stated that they are purchasing a 4-bedroom home on contract for $4200 and that he and his present wife have 7 children residing with them. Five of the children are his wife's by a prior marriage and two were born to them. The appellee and his wife sleep in one bedroom with their 14-month-old baby girl. Three girls, ages 15 years, 4 years and a 17-year-old married daughter sleep in another bedroom. Two boys, ages 16 and 13, sleep in a third bedroom and a 12-year-old boy sleeps in the fourth

bedroom, where the appellee intended that young Roy would sleep.

The appellee further testified that his usual take-home pay is between $80 and $90 a week. He also stated that his wife worked as a manager at a dairy products stand from 6:00 P.M. to 11:00 P.M. six days a week and that she earned $80 per week. In his testimony he stated that he wants to provide for his son's home and education. Although the appellee had never lived a greater distance than 30 miles from his son, he admitted that he never made any effort to see the child other than his attempt to visit following his wife's death.

Mrs. Verna Edwards stated that she had been married to the appellee for about 7 years. She testified that he had accepted the responsibility for her 5 children by a previous marriage, has treated them well and has supported them. During the seven years of their marriage he had been a good father and had given them love. Mrs. Edwards testified she met the child, young Roy, at his mother's funeral. She stated that the appellee had never proposed that they visit the child and to her knowledge he had never supported Roy. She further stated that she was willing to take the boy into their home and to be a substitute mother for him because he was the appellee's son and she thought he needed a mother.

Livingston, the appellant, was 76 years old at the time of the hearing, was a widower and semi-retired. He owned a 2-story, 4-bedroom house on a half acre in Elmwood, Illinois, free from any encumbrance. Two granddaughters, Doris, 18 and Colleen, about 14, children of the deceased Marie by other marriages, occupied one bedroom in the house, his grandson, young Roy, had his own room, and another room, which had been occupied by the boy's mother, was used as a guest room and the appellant occupied the fourth bedroom.

The appellant testified that he had never been in any

difficulties with the law, had no debts except his daughter's funeral expenses and two remaining payments due on a 1965 automobile he was purchasing. He stated that he had not been ill for some years, that his most recent annual physical examination did not reveal any health problems and that he believed he was in excellent health considering his age. The appellant did not use tobacco or alcohol and was licensed to drive an auto without the use of glasses.

He receives a pension from a tractor manufacturer, where he had been employed for 15 years, of $69.55 a month and receives Social Security payments of $115 each month. He testified he served as a part-time caretaker at a cemetery, and earned approximately $42 per month for this work. He stated that his late daughter, Marie, had received $120 per month from the Veteran's Administration and the Social Security Administration for his granddaughter, Colleen, and apparently he would now obtain these benefits as Colleen's guardian.

The appellant had been the principal support of his daughter and young Roy during the time they lived with him. He testified that he had assumed the role of father to the child and treated him as a son. He had attended some of the activities in which the child had participated and had tried to help the boy in these activities. He also had shared with the mother the responsibility of disciplining the child. He stated he loved the boy and wanted to keep him, but that if the child, by his own volition, decided to live with his father he would be understanding.

The appellant's adopted daughter, Dora, daughter of the late Marie, who testified on behalf of the appellant, was 18 years old at the time of the hearing and was attending a key punch operator's training school in Peoria, Illinois. She stated that since the death of Marie Edwards, she had taken over Marie Edwards's role in the family and that she shared the cooking and other household chores with Colleen. However, in the oral arguments before this court it was related

that subsequent to the finding below, Dora had married and had left the household.

Max Morse, a high school teacher in Yates City, Illinois, called on behalf of the appellant, stated that he had lived in Elmwood, Illinois, since 1951 or 1952, and had known the appellant for about the same length of time. Morse lived about 3 blocks from the appellant's home, and he had become acquainted with the appellee and his family at American Legion outings and through Cub Scout meetings which he attended with his son. Morse's son and young Roy were in the same grade at school; both belonged to the Cub Scouts and were playmates. It was Morse's opinion that Roy Elvin was a "fine boy" and that the reputation of the appellant was beyond reproach in the community. He had never known the appellant to be ill and he believed that the boy was happy at the appellant's home. He further stated that the boy referred to the appellant as "Dad".

James Riley lived 4 blocks from the appellant's home and his children were playmates of Roy Edwards. Riley stated that he knew Roy and that he found him to be well behaved and a "good all around boy". He believed that his good qualities of character reflected the training of the appellant. Riley had visited the appellant's home several times and he found it to be a good average home. Young Roy referred to the appellant as "Dad" and several times indicated to the witness that he wished to remain with the appellant.

Dr. Jerome H. Cripe, a physician specializing in child and family psychiatry, whose practice exclusively involved the evaluation and treatment of adolescents, had examined young Roy Edwards and the other members of the appellant's family on October 11, 1967. He stated that he spent approximately a half hour interviewing the boy's family as a group and one half hour to three quarters of an hour with Roy Elvin individually. In his opinion the examination was adequate to form some conclusions about the boy's psychological condition. Dr. Cripe concluded that the boy had the

activities, interests and feeling of a fairly typical 12-year-old boy; that he had a normal relationship with the other members of his family; he showed normal grief because of the death of his mother, and he showed no significant psychiatric disturbance at that time. It was also his judgment that the child had meaningful and important emotional ties to the members of the appellant's family and that he was in a fairly stable emotional environment. It was Dr. Cripe's professional opinion, based on this examination and his analysis of the boy and appellant's family, that it would be emotionally and psychologically harmful to remove the boy from the appellant's home.

The appellant contends that a review of all the testimony demonstrates that the award of custody to the appellee, the natural father of young Roy, was contrary to the manifest weight of the evidence and not in the child's best interest. He also argues that the evidence established that the appellee had forfeited, at least for the present, his right to custody of the child by his past conduct, which showed a settled purpose to abandon all parental duties and relinquish all parental claims.

The appellee submits that the evidence shows that either party is fit to have the care and custody of the boy. Under such circumstances, he urges, absent a showing that the father had forfeited his rights to custody, the natural father is to be preferred. There is no evidence here, he contends, of any conduct which would constitute a forfeiture of his rights to the custody of his child. Hence, the determination of the trial court was not against the manifest weight of the evidence.

*Habeas corpus* has long been recognized as the appropriate proceeding to determine the custody of minor children and its propriety is not contested by the parties. *Faris* v. *Faris,* 35 Ill.2d 305; *People ex rel. Noonan* v. *Wingate,* 376 Ill. 244.

We disagree with the appellee's contention that in such

a proceeding his parental right to custody cannot be superseded unless he is shown to be unfit or to have forfeited his rights. In *Giacopelli* v. *The Florence Crittenton Home,* 16 Ill.2d 556, we stated at 565: "It is always recognized that a natural parent has a superior right to the custody of his child. That right, however, is not absolute and must yield to the best interest of the child. Such superior right only obtains when it is in accord with the best interest of the child. (*Cormack* v. *Marshall,* 211 Ill. 519; *Stalder* v. *Stone,* 412 Ill. 488; *People ex rel. Noonan* v. *Wingate,* 376 Ill. 244.)"

The best interest of the child is the standard and it is not necessary that the natural parent be found unfit or be found to have legally forfeited his rights to custody, if it is in the best interest of the child that he be placed in the custody of someone other than the natural parent. See *Giacopelli* v. *The Florence Crittenton Home,* 16 Ill.2d 556; 67 C.J.S. Parent and Child § 11; 27 Am. Jur., Infants § 108; and also see *Halstead* v. *Halstead,* 259 Iowa 526, 144 N.W.2d 861.

Again, in *Giacopelli* at page 565 we stated: "The parent need not be shown to be totally unfit to rear the child in order to deny to him the custody of the child. Fitness of the parent is only one of the factors to be considered in determining how the best interest of the child may be served. The sufficiency of the parents' home, its surroundings, and all other matters that have a bearing upon the welfare of the child are to be considered. (*People* v. *Weeks,* 288 Ill. App. 262.) The parents' natural rights must give way to the welfare and best interest of the child."

The "best interest of a child" standard is not always easily applied. The facts and circumstances of each case obviously must be considered.

The appellee, however, asserts that section 132 of the Probate Act (Ill. Rev. Stat. 1967, ch. 3, par. 132), requires that he be awarded custody under these circumstances since

he is a "fit person". Section 132 provides that if a parent is dead and the surviving parent is competent to transact his own business and is a fit person, he is entitled to the custody of the child. The trial court did find that the appellee was a fit person to have the care and custody of the child, but as we have stated, fitness is only one of the factors to be considered. (*Giacopelli* v. *The Florence Crittenton Home*, 16 Ill.2d 556.) This right of the natural parent, as provided in the statute, must yield to the best interest of the child even though the parent is a fit person. *Mackie* v. *Mackie*, 88 Ill. App. 2d 61; *In re Guardianship of Nichols*, 70 Ill. App. 2d 376.

We recognize that custody questions such as this are among the most difficult and sensitive presented to courts for resolution. We recognize, too, that in viewing a judgment of a trial court respectful weight must be given the consideration that the trial court had the opportunity of observing the witnesses. However, we are persuaded that the award here of young Roy's custody to the appellee was contrary to what the manifest weight of the evidence showed to be in the boy's best interest.

The appellee made no effort to visit his child after leaving the appellant's home until his wife died in July 1967, even though he never lived a greater distance than 30 miles from the boy. During the period from 1956 to 1967, the appellee never contributed to the support, education and welfare of the child. The record indicates that the appellee showed no interest in the welfare of the child for over 11 years and never assumed any of the responsibilities of a parent. The boy and he were strangers to each other. The child was apparently happy, well adjusted and had been properly developing in the environment of appellant's home. He had established, within limitations, a father-son relationship with the appellant. The evidence showed that the appellant's home afforded affection, understanding guidance, security and a generally wholesome atmosphere. Dr.

Cripe, the child psychiatrist, expressed the opinion that to remove the child from his environment would have a detrimental effect on his emotional and psychological well being.

Too, the child had recently experienced a grave shock through the loss of his mother. It would appear preferable to permit the child to remain in surroundings that he knew and had lived in for some time. See *Mackie* v. *Mackie,* 88 Ill. App. 2d 61.

Considering all these circumstances we deem it was not conducive to the child's best interest to remove him from a stable and adequately wholesome environment for the apparently primary purpose of placing him with his natural father, who was for practical purposes a stranger. *Cf. Giacopelli* v. *The Florence Crittenton Home,* 16 Ill.2d 556; *Halstead* v. *Halstead,* 259 Iowa, 526, 144 N.W.2d 861; *Garvin* v. *Garvin* (Iowa, 1967), 152 N.W.2d 206.

However, while we consider that the welfare of the child would have been best served by continuing his custody in the appellant, in view of certain circumstances, *viz.,* the age of the appellant, the fact that the child has now lived with the appellee for a time and the marriage of the appellant's adopted daughter, we believe that the appellant should not now be awarded permanent custody of Roy Elvin Edwards but only temporary custody. We reverse the judgment and remand the cause to the circuit court of Peoria County for the entry of a decree awarding temporary custody and control of Roy Elvin Edwards to the appellant. We direct also that the order should provide for reasonable and liberal visitation privileges in favor of the appellee to the end that the love, affection and understanding which should exist between father and son can be fully developed. Such development will be of great importance should future circumstances direct a transfer of young Roy's custody to the appellee. Jurisdiction of the case should be retained by the circuit court to permit modification of its decree should there be a change of circumstances affecting the child's wel-

fare or should there have been such a change and it does not appear in the record before us. *Cf. People ex rel. Bukovich* v. *Bukovich,* 39 Ill.2d 76, 81; *Mackie* v. *Mackie,* 88 Ill. App. 2d 61.

*Reversed and remanded, with directions.*