*In re* ELAINE ROSS *et al.*, Minors.

(No. 74-19;

Third District—June 4, 1975.

Richard L. Ryan, of Chicago, for appellant Illinois Department of Children & Family Services.

Barbara Caulfield, of Chicago, for appellants Elaine and Susan Ross.

Howard Eglit, of counsel, for amicus curiae American Civil Liberties Union.

Martin Rudman, State's Attorney, of Joliet (Rafael Toruno, of counsel), for the State of Illinois.

PER CURIAM (Panel consisting of Alloy, P. J., Stengel, J., and Scott, J.):

This is an appeal of Elaine Ross and Susan Ross, minors, from a custody decision of the Juvenile Division of the Circuit Court of Will County by which it was determined that the minors, Elaine Ross and Susan Ross, should be returned to their natural parents. The basis of the decision was founded upon the finding that the children had been physically and emotionally neglected while in the care of their foster parents.

On appeal in this court, it is contended that the order of the trial court erred in not finding that it was in the best interests of the minors that custody be awarded to the foster parents. This cause has aroused

considerable interest by reason of the fact that the children concerned had been in the foster home of Mr. and Mrs. Jack Reeves of Park Forest for a period of 6½ years. The appeal challenges the order of the Will County Circuit Court which required the Department of Children and Family Services (hereinafter referred to as "Department") to remove Elaine Ross and Susan Ross from their foster parents (the Reeves) and take all necessary steps to accommodate the return of the children to their natural parents. The two girls involved are 14 and 12½ years old respectively. The Department is guardian for the children and it also challenges the order of the Circuit Court of Will County.

A review of the salient facts is essential in an understanding of the issues before us. The record discloses that Elaine and Susan Ross were first removed from the home of their parents in 1966, following a finding of neglect. They were placed in the foster home of Mr. and Mrs. Jack Reeves, in Park Forest, where they spent the next 6½ years, as we have indicated. The younger sisters, LuAnne and Gail, lived with Mr. and Mrs. Reeves for much of this time also, while their older sisters, Debbie and JoAnne, spent some time in other foster homes.

In early 1972, the Rosses were found to be sufficiently rehabilitated to provide a proper environment for their children. All of the girls, except Elaine and Susan, were returned to the Ross home shortly thereafter. Elaine and Susan, however, continued to manifest considerable hostility toward their natural parents and expressed the desire to remain with the Reeves family.

In March of 1973, Elaine and Susan were placed in the Guardian Angel Home for the purpose of beginning the transition for return to the Ross home. Following several months of separation from the Reeves, however, the girls still remained adamant about not returning to their natural parents.

In the order of the circuit court (which is challenged by this appeal) which was entered on November 21, 1973, the trial court found that Mrs. Reeves had physically and emotionally neglected the children and psychologically abused them. The trial court found that it was in the best interest of the girls to be kept away from their foster home and to be returned to the Rosses as soon as practicable. The trial judge noted that due to what he termed "governmental neglect" on part of the Department, the children would be required to remain in a neutral environment such as the Guardian Angel Home, in order to gradually make the transfer from the Reeves home to the Rosses.

. While the appeal generally questions all of the findings of the court and the propriety of the court order, it particularly attacks the trial

court's use of *in camera* interviews with the children without revealing the substance thereof for the record. More specific facts of the case relating to these issues will be referred to hereafter.

Initially we are confronted with a new issue which has risen in the course of this appeal. The trial court determined in 1972 that the interests of the Department as guardian of the children were in conflict with the interests of the minors themselves, and accordingly appointed a guardian *ad litem* to represent the girls, as provided by statute. (Ill. Rev. Stat. 1973, ch. 37, § 704-5(2)). Notice of appeal on behalf of the children, however, was filed by Ms. Barbara Caulfield who was not previously the attorney of record in this cause. The Will County State's attorney, appellee in this cause, sought to dismiss the appeal on the ground that Professor Caulfield was not authorized to represent the minors since they already had a guardian *ad litem*. We directed that the motion to dismiss be taken with the case for consideration and ordered the parties to brief the issue and argue it with the rest of the case. We also granted leave to the American Civil Liberties Union to file a brief on this issue as amicus curiae. Such brief was filed in support of the right of the minors to engage counsel to appeal on behalf of the children. The Attorney General of the State of Illinois, also appears on behalf of the Department and in support of a contention that custody should be awarded to the Reeves as foster parents, in the best interests of the minors.

The motion of the State's attorney points out that Elaine and Susan Ross have been wards of the court since May 1967 under the guardianship of the Department. It is also noted that a guardian *ad litem* was appointed by the court on June 8, 1972, to represent the minors in the ensuing custody hearings. The motion states that the guardian *ad litem* has neither withdrawn nor been removed by the court, and concludes that the children, as wards of the court, lack the capacity to effectively dismiss their court appointed attorney and retain their own counsel for the purposes of appeal. On behalf of the children, Professor Caulfield responds that the children contacted her as early as October 1973, and that the Department itself officially retained her on behalf of the two girls. She points out that the Department as guardian of the children has authority to supervise their legal affairs. (Ill. Rev. Stat. 1973, ch. 37, § 701—11(a).) In the alternative she contends that the minors have a constitutional right to counsel of their own choice and have a right to contract for counsel in this State. She also states that Elaine and Susan Ross have sufficient intellectual capacity to act in selecting their own attorney. On the basis of the record, we find it unnecessary to decide the

larger issue of whether a minor has an absolute constitutional right to counsel of a minor's own choice in a dispositional hearing under the Illinois Juvenile Court Act, where it is obvious that Ms. Caulfield properly represents the girls on appeal by virtue of her engagement to do so by the Department.

■■ The "right to counsel" in a constitutional sense refers to the right granted by the Sixth Amendment of the United States Constitution and by the Illinois Constitution (Ill. Const. art. I, § 8 (1970)), to an accused in a criminal proceeding. We realize it is not clear to what extent this right to counsel, generally speaking, would apply in a proceeding regarding custody of dependent or neglected children under the Juvenile Court Act. We note that the right to counsel has been found applicable in delinquency proceedings (*In re Gault* (1967), 387 U.S. 1, 41, 18 L.Ed.2d 527, 554, 87 S.Ct. 1428). We realize, however, that delinquency cases under the Illinois Act are akin to criminal cases, while dependency and neglect cases are civil in nature. (*Cf.* Ill. Rev. Stat. 1973, ch. 37, § 704-6 (burden of proof)). That there are similarities has been noted in many cases such as the observation of Judge Reeves in *Brown v. Chastain* (5th Cir. 1969), 416 F.2d 1012, 1027, where he states in his dissenting opinion:

> "A change in parental bondage during the tender years is hardly less upsetting of one's pattern of life than is the denomination and possible commitment of a child as a 'juvenile delinquent.' "

■■ We, therefore, invoke the well-established principle that a case will not be decided on a constitutional basis if there is some other ground upon which the case may be disposed of. (*Ashwander v. Tennessee Valley Authority* (1936), 297 U.S. 288, 347, 80 L.Ed. 688, 711, 56 S.Ct. 466.) The principle has also been recognized by the Illinois Supreme Court in determining its jurisdiction over alleged constitutional issues. (*Cf. Moran v. Zoning Board of Appeals* (1957), 11 Ill.2d 374, 377, 143 N.E.2d 16.) We believe that the principle is properly applicable here. This narrows the question before us to a consideration of a situation where the court enters an order in a dispositional hearing which runs contrary to the desires of the minors, and the guardian *ad litem* appointed for them does not prosecute the appeal, are the children then unable to prosecute the appeal in any manner through employment of an attorney or through the good offices of the Department as guardian? Obviously, the children should be afforded an opportunity to appeal. The minor, in a dispositional hearing, is guaranteed the right to counsel and the right to appeal (Ill. Rev. Stat. 1973, ch. 37, §§ 701—20(1)(3)). Generally these rights

should be enforced by the guardian of the child, which in this case is the Department acting under its authority to supervise the child's legal affairs (§ 701-11(a)).

■■ In the situation in the case before us, according to the affidavit of the legal counsel for the Department, such counsel conferred with the guardian *ad litem,* after the entry of the court order, and the guardian *ad litem* indicated he did not intend to appeal nor did he believe he was authorized to proceed beyond the trial court level. It is also alleged, in the answer to the motion of the State's attorney, that the court did not inform the minors of their right to appeal the order. The Department also retained Ms. Caulfield to represent the children even though the children had originally contacted her to prosecute the appeal. It is obvious that the Department could properly retain counsel of the children's choice to prosecute the appeal, when the guardian *ad litem* indicated he would not appeal the order. If, it could be said, that the better procedure would be for the Department to go before the court for approval before so proceeding, we do not believe such procedure was indispensable under the facts in this case and such failure should not now prejudice the interests of the minors. We also note that the possible conflict of interest, which at one time existed, does not appear to exist at this time since the Department has changed its position and does not actively seek at this time to remove the girls permanently from the Reeves' home and to return them to the Ross home. Our conclusion, therefore, is that Barbara Caulfield is properly authorized to represent the Ross girls in this appeal and that the motion to dismiss the appeal should be denied.

The principal issue with which we are concerned in this cause involves the propriety of the trial court's order and the insufficiency of evidence to support some of the findings behind such order. A review of the facts is essential to an understanding of this issue.

Paul Ross met his wife, Terencia, while Ross was on Naval duty at Subic Bay in the Philippines, and they were married in 1958. They returned to the United States the following year. By 1966 they had six daughters and were also involved in serious family and marital difficulties. Not only was Mrs. Ross about to undergo a hysterectomy, but Mr. Ross had a serious drinking problem, was physically abusing his wife, and was apparently openly unfaithful to her. There was considerable neglect of the children, including lack of affection and supervision and a failure to provide for their physical and emotional needs. In February of 1966, a temporary order was entered in the Will County Circuit Court naming the Department of Children and Family Services as guardian of the children. In September, the order was amended to allow foster placement, and JoAnne, Elaine, Susan and LuAnne were

placed with the Reeves family. Debbie, the oldest girl, remained with the Rosses, while the youngest girl, Gail, went to another foster family. In the next few years, Debbie and JoAnne were both placed elsewhere and Gail lived with her other sisters at the Reeves' house. In May 1967, the order of the court was formalized by a finding of neglect and dependency, which was entered by agreement of the parties. The guardianship and foster care were continued.

The record in this case is voluminous and comprises almost 2,000 pages. It consists chiefly of various documents and reports made part of the record. Most of these are Department reports made by caseworkers. The reports in the record indicate that initial visits between the Rosses and the children at the Reeves' home were apparently constructive, but that soon Mr. Ross began showing up for visits in a drunken or angry condition. The children began complaining that their father drank all the time during the visits. Finally, the Department concluded that the visits were of no value to the participants since there was no real contact between the parents and the children during visitation. The visits were temporarily discontinued. Following the May 1967 hearing, visitation began again but several of the girls, including Elaine and Susan, began complaining and manifested hostile feelings concerning their parents. When it appeared that the Rosses were improving their relationship, JoAnne and Gail were returned to the Ross home in late 1967. By mid-1968, however, Mrs. Ross was talking about leaving her husband and the Department removed Debbie, JoAnne and Gail to foster care. Mrs. Ross continued visits to the children, but the caseworkers found that such visits were of no value to the children and suggested that Mrs. Ross could not relate to the girls nor did she show any particular interest in them. By the end of 1968 (and possibly before) the Reeves' began expressing opposition to the continued visitation.

. A few months later, the Rosses had patched things up again, but one caseworker observed that it was unlikely that they would ever be able to provide an adequate physical and emotional environment for their children and noted that two of the girls apparently Elaine and Susan, would never be able to completely accept even visits by their natural parents. Once again the Rosses marriage fell apart, and in September 1969 Mrs. Ross obtained a divorce. Over the next two years it appears that the Rosses saw each other and by mid-1971 they were again living together. Visitation throughout this time was generally unsatisfactory and Elaine and Susan continued, adamantly, to oppose any visitation at all. The Department also reflects that Mrs. Reeves was opposed to visitation, to the point of being uncooperative.

In April 1971, the Department found Elaine, Susan and LuAnne

doing adequately in school and presenting no behavioral problems either there or at home. The report noted that all three girls insisted on using the surname "Reeves" instead of their real name of Ross. It was thought at this time that the best long-range plan was for permanent foster care in the Reeves home for Elaine, Susan, LuAnne and Gail. Another report in late 1971 by a new caseworker found Elaine and Susan, along with LuAnne, expressing considerable dislike for and rejection of their natural parents and refusing to go on visits. Mrs. Reeves was found to be very attached to the children, possessive, not supportive of visitation, and with negative feelings about the Rosses.

By March 1972, the Rosses were improving rapidly, and the Department decided to begin the process of transferring the girls back to the Ross home beginning with LuAnne and Gail. Those two girls were 8 and 6 years old respectively at the time and had been with the Reeves for 5½ and almost 4 years respectively. Mrs. Reeves opposed such action and intervened in court to stop it, but the trial court approved the Department plan and ordered the two younger girls to be picked up on May 8, 1972. On that day, caseworkers arriving at the Reeves home were met by neighbors and television cameras. They backed away and obtained a writ of habeas corpus with which the Reeves complied and the girls were taken to Maryville Academy to be in a neutral environment. A report several weeks later suggested that LuAnne's often hesistant and sullen mood was improving, and also noted that Mrs. Reeves had made some unsuccessful attempts to phone LuAnne and Gail at the Academy despite court warnings against such actions. A week after LuAnne and Gail were removed, the Department decided to proceed with plans to remove Elaine and Susan and ultimately return them to the Rosses. The decision was based in part on the fact that, though Mrs. Reeves provided an adequate home for the children, she encouraged negative feelings in the girls about their real parents and was uncooperative with the Department regarding visitation. It was felt that no relationship between the girls, and either the Deparment or the Rosses, could be developed while the girls remained with the Reeves.

Psychiatric reports made in August 1972, found that Gail and LuAnne, who had been moved to the Ross home from the Academy in June, were in reasonable condition. The Rosses had remarried in May, just after the children were taken from the Reeves home, and psychiatric reports suggested that though there might be some problems, the Rosses were "sincere" and appeared to "clearly demonstrate their readiness to resume parental responsibilities." One psychiatrist, Dr. Kruglik, also examined Elaine, Susan and the Reeves. He found the girls lively and responsive,

yet patient, and still intent on living with the Reeves' and not the Rosses. He found Mrs. Reeves extremely attached to the girls, to the point where she had trouble viewing the situation objectively. He concluded that considerable family counseling would be required if the two girls were to be returned to the Ross home.

In January 1973, the Department had submitted a plan for eventual return of Elaine and Susan to their parents. The plan was approved by the court and on March 9, 1973, the two girls were taken to the Guardian Angel Home in Joliet. The court ordered that there be no communication between the girls and the Reeves. Twelve days later, the Reeves' attorney asked for a modification so that the girls might see their foster parents, reporting that Elaine was suddenly using profanity and Susan's hair was turning gray and that both girls were very nervous and bored. The modification was refused.

In June 1973, 3 months after the separation from the Reeves', the girls were still strongly against returning to the Ross home. The Department then changed its position, concluding that it could not "brainwash" the children. A report in July suggested that the girls visited the Rosses during this time only because they were finally told that after four such visits they could see their foster parents again.

At a court hearing on August 22, 1973, the court found the Ross home situation satisfactory and discharged the Department as guardian of Debbie, JoAnne, LuAnne and Gail. It then considered reports by Dr. Kruglik and a Dr. McBride, concerning their interviews with Elaine and Susan. Dr. McBride found that both girls looked to the Reeves as their parents and had strong feelings of affection and loyalty for them. He found both girls reasonably adjusted, Susan a little more so than Elaine.

Dr. Kruglik concluded that a return of the girls to the Ross home would not only mean extensive family counseling, as had been suggested the year before, but also individual therapy for Elaine and Susan. He stated that there was no way to predict if counseling and therapy would be successful. Dr. Kruglik also found the girls adamant about staying with the Reeves and predicted "havoc" if the return to the Ross home was carried out. He also commented on the great progress made by the Rosses in stabilizing their lives and re-establishing their family, and he feared destruction of these accomplishments if Elaine and Susan were returned to the Ross home.

A report presented at a later hearing by a Dr. Shlensky found the Reeves to be basically fit persons, and Mrs. Reeves was described as of good character and principles, sensitive, well oriented and maternal. Her husband was found to be bright, well adjusted and pleasant. The

report noted that the Reeves had four older children (the youngest was 19) which were Mrs. Reeves' by a previous marriage. The Reeves had been married for 15 years.

The trial court interviewed Elaine and Susan in chambers on August 22, 1973, at the request of the parties and reported on the interviews at a hearing in October. The trial court stated that both girls talked about career plans such as being secretaries and stewardesses, and other such things. When he asked them about the custody situation, they both expressed strong desires to remain with the Reeves'. The court reported that when Elaine was asked about her natural parents she "proceeded to tell me things   *   *   *   all of which were false. And I don't want to repeat them because they do constitute slander. And they were the same comments, however, that I have heard being made on television and some of the news media". The trial judge also revealed that he had given both girls the "house-tree-person" psychological test previously given by Dr. McBride because he questioned some of Dr. McBride's conclusions. The court, however, would not discuss the results of the tests.

The court's final order on November 21, 1973, which is challenged in this appeal, incorporates several findings of fact and law which may be summarized as follows: (1) that Elaine and Susan Ross were physically and emotionally neglected, and psychologically abused, while in the custody of Mrs. Reeves; (2) that it was in the girls' best interests not to be placed in the custody of Mrs. Reeves and that they instead should be placed in interim care and returned to their natural parents as soon as practicable; and (3) that the Rosses were rehabilitated and were fit and proper parents and should have custody of the two girls. The court ordered that the Department take all steps necessary to bring about the return of the girls to the Ross home including interim care and treatment in a place like Guardian Angel and that the Department refrain from using Mrs. Reeves to care for the two girls in the future.

While all child custody cases are perhaps "the most difficult and sensitive presented to courts for resolution," the cause before us is perhaps more difficult for a number of reasons. The findings of the trial court ordinarily are entitled to considerable weight in custody cases since the court is most intimately familiar with the facts and persons involved. (*People ex rel. Edwards v. Livingston* (1969), 42 Ill.2d 201, 210, 247 N.E.2d 417.) We must conclude, however, from an analysis of the entire record that the court's findings of neglect and abuse on the part of Mrs. Reeves are contrary to the manifest weight of the evidence and, in fact, do not appear to be supported by significant evidence. In finding Elaine and Susan physically and emotionally neglected, the trial court apparently relied heavily, if not exclusively, on the reports of school

psychologist Ruth Sporer, which were made on March 20, 1972. The reports indicated some adjustment problems, unhappiness, withdrawal and stealing on the part of the young Ross girls, LuAnne and Gail. There was, however, no suggestion that such problems existed as to Elaine or Susan. The court concluded that these reports showed neglect toward LuAnne and Gail and, presumably, assumed that such neglect was extended to Elaine and Susan. The trial court apparently also concluded that the lack of problems as to Elaine and Susan was due to their early upbringing with the Rosses.

It seems to us that the trial court overlooked the fact that Elaine and Susan were removed from the Ross home at ages 5 and 4 respectively because of physical and emotional neglect of them by their parents and the poor family situation. This could hardly have been a good basic upbringing. It is further noted that LuAnne lived with the Rosses until she was 3 years old. It appears that the emotional problems found in the two youngest Ross girls might have been due to exposure to the Rosses and the general unstable nature of their lives. From the record it appears that Gail was poorly taken care of, as a baby, when she was on visits to her real parents, and there was even an incident with sexual overtones with LuAnne and her father. Mr. Ross was often drunk or violent during their visits, and Mrs. Ross was inattentive to the children during these periods. While the situations manifested themselves in the older children as dislike and contempt for their natural parents, they also apparently resulted in emotional problems for the younger girls. We have been directed to no evidence of any neglect of the children by Mrs. Reeves, and the conclusion of the trial court as to this issue appears to be unsupported in the record. There is some mention of Gail and LuAnne appearing for the Sporer interviews in an unkempt appearance but this could be due to any number of things. Even if the emotional problems which showed up as to LuAnne and Gail might be due to some lack on the part of Mrs. Reeves, there is no suggestion that Elaine and Susan suffered from the same condition. The reports in fact were virtually unanimous in finding that Elaine and Susan are well-adjusted, pleasant girls of at least average intelligence who have had a good unbringing in a loving foster home. The total lack of love on the part of Mrs. Reeves, as apparently found by the trial court, is not supported by the evidence, which actually shows a great deal of love and concern flowing from the Reeves, and reciprocal feelings on the part of the children, especially Elaine and Susan.

The finding of the court that there was "psychological abuse" by Mrs. Reeves appears to be a way of disapproving of Mrs. Reeves general attitude and conduct as a foster mother, stemming from her alleged re-

fusal to allow a relationship between the children and their family; in baptizing the children as Baptists, although the family religion is Catholicism; in brainwashing the children against their parents; and in being prejudiced against Mrs. Ross because of her Filipino nationality. Certainly there was evidence that Mrs. Reeves appeared to oppose the visits between the girls and the Rosses, perhaps with some good reason. It is true that the foster parent is normally required to provide a good home for the child while the natural parents are establishing a family homestead. Perhaps Mrs. Reeves overstepped this role by interfering with the visitation periods. Certainly any intolerance for Mrs. Ross expressed by Mrs. Reeves on grounds of race or creed is totally improper. Yet, it is difficult to see that Elaine and Susan were psychologically abused by any of the acts of Mrs. Reeves. There is no real evidence suggesting "brainwashing," but there is other evidence which clearly indicates reasons why the girls came to dislike their natural parents. Reports recognized hostility on part of the children, before any opposition to visitation was expressed by Mrs. Reeves, and the very nature of the visits and the conduct of the Rosses certainly would suffice to build antagonistic feelings in the children. While we agree that the aims of foster placement were perhaps jeopardized by Mrs. Reeves we cannot conclude, from all the evidence, that Elaine and Susan were psychologically abused thereby.

The basic question which was before the trial court and is before the court at this time is to determine where the best interests of the children lie as between the real and foster parents, all of whom appear to be fit as custodians. In Illinois, a natural parent has superior claim to the custody of his children, but that claim may be overcome in certain circumstances by a showing that the best interests of the child require custody in some other party. (*Giacopelli v. Florence Crittenton Home* (1959), 16 Ill.2d 556, 158 N.E.2d 613; *People ex rel. Edwards v. Livingston* (1969), 42 Ill.2d 201, 247 N.E.2d 417; *Look v. Look* (3rd Dist. 1974), 21 Ill.App.3d 454, 315 N.E.2d 623.) This does not mean that children can generally be taken away from their parents by simply making a showing that the children would be better off elsewhere. When, however, for a variety of reasons, a child's custody is brought before the court, the key to the resolution of that issue should in all cases be the best interests of the child.

■■ When the child has been in custody of someone other than the natural parent for a substantial period of time, it is entirely likely that ties between the child and custodian will grow so strong as to warn, emphatically, against returning the child to the child's natural parent. In such situation the natural parent need not necessarily be proven unfit, to be denied custody. *Giacopelli v. Florence Crittenton Home,* 16 Ill.2d

556, 158 N.E.2d 613; *People ex rel. Livingston,* 42 Ill.2d 201, 247 N.E.2d 417.

Counsel for the children make reference to the concept of the Reeves as being "psychological parents," which we believe reflects the relationship which has arisen. The report of Dr. McBride, which we discussed earlier, revealed considerable feelings of love and loyalty on the part of Elaine and Susan for the Reeves. Elaine told Mr. McBride that Mrs. Reeves "is the only mom I ever had and the only one who has showed love to me and Sue." These facts are corroborated by other reports in the record. The evidence clearly demonstrates that Elaine and Susan look upon the Reeves as their parental figures and in that sense perhaps are "psychological parents" for the girls. In *Look v. Look* we made a statement where a surviving parent sought custody as against grandparents, that:

> "When the people having the actual custody of the child at the time a change is sought have properly provided and supervised its needs for a substantial period of time and the child has become attached to the environment and to the grandparents who have made possible the happiness, security and comfort of its early years, a court is not justified in transferring that custody to another, except for the most cogent reasons." *Look v. Look,* 21 Ill.App.3d 454, 457.

We understand that it is normally desirable that the Rosses be able to raise their own children. We must remember, however, that the two Ross girls here involved have lived with the Reeves for over 6½ years and have been away from their real parents, except for visitations, for an even longer period than that. Elaine and Susan have been expressing considerable dislike for their parents for several years while showing affection for their foster parents, and they even use the surname "Reeves." Under these circumstances, we feel that to suddenly uproot the girls from their foster home, in order to attempt replacement in the Ross home, is obviously not, immediately, in the best interests of the children. Irrespective of the basis for such feelings, the adamant expression of the girls over the years not to return to their natural parents should be given considerable weight in the court's determination, since these children are now 14 and 12 years old and are of average to above-average intelligence.

We believe it is highly significant that the affidavits filed by the children in this cause, just before oral arguments in April 1975 indicate a change of attitude, in part, by Elaine and Susan. After 2 years in the Guardian Angel Home, according to Elaine's affidavit, she wishes to remain at the home while she gets a chance to know her parents as they

are now. She wishes to have visitation with both the Reeves and the Rosses. Susan's affidavit, however, indicates her preference to return to the Reeves' home, but she now wishes to visit her real parents also. The desire to visit the Rosses, on part of both girls, is a striking change of attitude, and so is the further decision by Elaine to remain in the neutral environment of the Guardian Angel Home. These requests appeared in a document, signed by the girls, filed in our court just before oral argument entitled "Motion for Leave to Amend Relief Requested." The change in attitude, in part, suggests that the best interests of the children may no longer lie in a return to the Reeves' house, as the record substantially indicated 1½ years ago.

Since there are many factors to be considered, principally the current home environment in the Ross house and the reasons for the change in attitude in Elaine and Susan, as shown by the affidavits recently filed in this court, we do not feel that we should make a conclusive determination, on a record which is a year and a half old, since too many intervening factors may require modified or alternative solutions. We thus conclude that this case should be remanded to the trial court for the taking of further evidence concerning the present situation of the parties, and a redetermination of what is in the best interest of the children at the present time. We emphasize again that the preferences of Elaine and Susan, while not conclusive, should be given great weight in this determination. Obviously the psychological harm which could result from a failure to fulfill the desires of Elaine and Susan may easily outweigh any possible benefit of placement with the natural parents. See *Marcus v. Marcus* (1st Dist. 1969), 109 Ill.App.2d 423, 248 N.E.2d 800.

■■ As an aid to the trial court on remand, we believe it is best to briefly consider other issues raised by appellants relating to the *in camera* interviews with the children conducted by the trial court. It is the general rule that all court proceedings which are the basis of a judgment or order should be set forth in the record so that a court of review may make an informed and intelligent resolution of the issues on appeal. We also recognize, however, the nature of custody cases, and the often bitter and emotional atmosphere which surrounds them, so that a trial court must have some discretion as to interviewing the children in the privacy of the court chambers. (*Oakes v. Oakes,* 45 Ill.App.2d 387, 195 N.E.2d 840, 99 A.L.R.2d 954.) As indicated in the *Oakes* case, an order will not be reversed because of such procedure occurring, unless it appears that some prejudice may have occurred. Such off the record interviews should be for limited purposes only and used sparingly, if possible, for the chances of abuse may not be ignored. As noted in

*Oakes* also, the court, on motion of one of the parties, should reveal the substantive portions of the interview.

■■ In the cause before us, the trial court did reveal substantive portions of the interview, except for the results of the "house-tree-person" tests and the remarks Elaine made about her parents which the court would only say were "slanderous." Apparently the trial court felt qualified to question and analyze the testimony of psychologists. It may very well be that the trial court was so qualified, but such separate testing and conclusions derived therefrom not shown of record would require reversal. It is not good practice for a court to undertake independently, any such analysis. A court should review and decide a case only on the basis of the record. *Henrikson v. Henrikson* (3rd Dist. 1975), 26 Ill.App. 3d 37, 40, 324 N.E.2d 473; *Walter v. Walter* (2nd Dist. 1965), 61 Ill.App.2d 476, 479, 209 N.E.2d 691.

■■ The trial court here questioned the competence or conclusions of psychological tests placed in evidence. Apparently the court undertook the "house-tree-person" tests independently and came to certain conclusions as the result of such private testing. Such procedure was not proper. All conclusions should be based upon evidence properly introduced in open court and subject to cross-examination and questioning by the parties or their counsel. Under the circumstances, any circuit judge who now proceeds in this case should not be involved in such testing, since it could be contended that the court might base a decision on factors which are not made part of the record. This cause should, therefore, proceed, upon remand, before a trial judge other than the judge who conducted the proceedings from which the present appeal was taken.

For the reasons stated, therefore, the order of the Circuit Court of Will County is reversed and this cause is remanded for further proceedings in accordance with directions and suggestions contained in this opinion.

Reversed and remanded with directions.