90 Ill. App.3d 292 (1980)
413 N.E.2d 428
In re CUSTODY OF CHRISTY ELIZABETH TOWNSEND.  (GARY DEAN TOWNSEND, Petitioner-Appellant,
v.
BRENDA POLING, Respondent-Appellee.)
No. 16177.
Illinois Appellate Court  Fourth District.
Opinion filed November 14, 1980.
*293 Laurence W. Grabb, of Ryan, Grabb, Cini & Bennett, of Mattoon, for appellant.
Burger, Fombelle, Wheeler & Dvorak, P.C., of Decatur, for appellee.
Tim Eaton, of Baird, Latendresse, McCarthy & Rowden, of Decatur, guardian ad litem.
Reversed and remanded.
Mr. PRESIDING JUSTICE MILLS delivered the opinion of the court:
A singular case.
The facts underlying this custody suit are as tragic as they are complicated. And although we are without the gift of Solomon, we are compelled to reverse.
Prior to 1976, petitioner Gary Townsend was married to Judy Townsend and they had a son, Alan. At some time thereafter, Gary began to have an intimate relationship with Dorothy Salmons, who was married to George Poling. George and Dorothy had a daughter, Brenda, the intervenor in this case. In approximately March 1976, Gary learned that Dorothy was pregnant with his child. He unsuccessfully sought a divorce from Judy and then left her and began living with Dorothy in the spring of 1976. Soon thereafter, Dorothy was divorced from her husband, George. Gary lived with Dorothy for about three months but then moved back with Judy. On October 14, 1976, Christy Elizabeth Townsend  whose custody is the pivot of this appeal  was born. Even though Gary no longer lived with Dorothy at that time, he had continued to visit her up to the time of Christy's birth and in fact took Dorothy to the hospital. After Christy's birth, Gary continued to visit with Dorothy and Christy, though Dorothy and Gary's relationship deteriorated. Throughout this time Gary's wife, Judy, was aware of Gary's visits with Dorothy.
*294 On December 11, 1978, Dorothy came to the Townsend home and shot and killed Judy. Dorothy was convicted of murder and sentenced to 30 years, and at the time of this trial she was incarcerated in the Dwight Correctional Center. From December 11, 1978, until the date of trial, Christy was under the care of her half-sister, intervenor Brenda Poling, who, along with her own daughter, Courtney, had lived with Dorothy prior to that date. At some time following December 11, 1978, Brenda, Christy, and Courtney moved into the mobile home of Brenda's father, George Poling.
Immediately after Judy's murder, Gary began his pursuit to acquire custody of Christy. He at that time was unaware of her whereabouts, but officials assured him that she was being cared for. Immediately after Dorothy's conviction for murder in April of 1979, Gary filed his petition to obtain custody. Brenda Poling, Christy's half-sister, intervened in that proceeding.
At trial, Gary presented several witnesses who testified to his close relationship with his son, Alan, his faithful attendance at his church, and his popularity with children. Gary testified that in the first six months or year of Christy's life he called on Dorothy and Christy two or three times a week. During this time, Christy came to know him as her father. He also testified concerning a spacious home that he was building and would be occupying soon.
Brenda Poling presented witnesses who testified to the close relationships between Brenda and Christy and between Courtney and Christy; Courtney and Christy are the same age. Because Dorothy went back to work soon after Christy's birth, Brenda had often had the duty of caring for Christy.
Dan Kiley, a child psychologist, had visited in Brenda's home and had seen Brenda, Courtney, and Christy in his office three or four times. He had reached the conclusion that the three shared a warm relationship. In particular, he was pleased that Brenda was taking Christy to visit her mother, Dorothy, at Dwight, and he thought that these visits would help Christy better understand her tragic background.
At the time of trial, Brenda, Christy, and Courtney were living with Brenda's father, George Poling, in his mobile home. Brenda testified that George is good with the children and that he seems to be a father figure to them. Under these living arrangements, Brenda, Christy, and Courtney all sleep in one bed in the mobile home's smaller bedroom.
Dorothy Salmons testified concerning the weekly visits that Christy makes to her at Dwight. She said that Christy always recognizes her as her mother and wants to stay with Dorothy or take Dorothy home.
In his closing argument, Christy's guardian ad litem recommended that she be placed with Brenda. The trial judge described this as one of *295 the most difficult cases he had been involved in during his nine years on the bench. He described each party as fit and suitable to have custody of Christy but noted that Gary had never had Christy in his home as his daughter. In addition, the court took into consideration the effect the entire situation would have on Gary's son, Alan. The judge decided it was in Christy's best interest to give custody to Brenda, with Gary having visitation rights.
On appeal, Gary contends that the trial court's award of custody to Brenda was erroneous because the court did not give adequate consideration to his natural right as a parent to have custody of his own child. (In addition, he contended that the trial court's order for him to pay child support was improper; however, he waived that issue at oral argument.)
Though her life in many respects is a sad one, Christy has in her favor the fact that two people, both fit as custodians, desperately want her as their child. We agree with the trial judge in his characterization of the facts of this case: It presents us with a difficult quandary and requires that we today answer a question that could much more easily be answered in hindsight. We disagree, however, with the trial judge as to his disposition of the case, for we do not think that adequate consideration was given to Gary's rights as the child's father.
Section 602(a) of the Marriage and Dissolution of Marriage Act provides in part as follows: "The court shall determine custody in accordance with the best interest of the child." (Ill. Rev. Stat. 1979, ch. 40, par. 602(a).) The provisions of the Act dealing with child custody do not allude to the requirement of finding the parent to be unfit before custody may be placed with someone else. Thus, this case is distinguishable from those decided under the Adoption Act, which requires a finding of parental unfitness before a child may be taken from a parent and adopted by someone else. Ill. Rev. Stat. 1979, ch. 40, par. 1510; In re Massey (1976), 35 Ill. App.3d 518, 341 N.E.2d 405; In re Ladewig (1975), 34 Ill. App.3d 393, 340 N.E.2d 150.
 1 It is clear under the cases dealing with custody that it is not necessary for the court first to find that the parent is unfit before it will award custody to a nonparent. In People ex rel. Edwards v. Livingston (1969), 42 Ill.2d 201, 209, 247 N.E.2d 417, 422, our supreme court said:
"The best interest of the child is the standard and it is not necessary that the natural parent be found unfit or be found to have legally forfeited his rights to custody, if it is in the best interest of the child that he be placed in the custody of someone other than the natural parent."
See also Soldner v. Soldner (1979), 69 Ill. App.3d 97, 386 N.E.2d 1153.
The "best interest of the child" standard is one that had been used by the courts of this State for many years prior to its inclusion in the Marriage *296 and Dissolution of Marriage Act. (See, e.g., Nye v. Nye (1952), 411 Ill. 408, 105 N.E.2d 300.) But along with the multitude of cases stating the best interest standard, we have also a rule of long standing that a natural parent has the superior right to the custody of his child. See, e.g., Cormack v. Marshall (1904), 211 Ill. 519, 71 N.E. 1077; Jarrett v. Jarrett (1952), 348 Ill. App. 1, 107 N.E.2d 622.
 2 Our problem today involves determining how strong the natural parent's right remains in light of the fact that a nonparent can obtain custody of a child, absent a finding that the parent is unfit. In reviewing cases which have dealt with a contest between a parent and a nonparent for custody of a child, we find that even though the nonparent can be given custody without a finding that the parent is unfit or has forfeited his rights as a parent, there is a presumption that it is in a child's best interest to be in the custody of a natural parent. (In re Marriage of Braden (1979), 70 Ill. App.3d 535, 388 N.E.2d 939; Eaton v. Eaton (1977), 50 Ill. App.3d 306, 365 N.E.2d 647.) The courts therefore require some special circumstances before actually awarding the child to the nonparent. For example, the Livingston court, while setting forth the rule quoted above, went on to note that the father seeking custody had had virtually no contact with the child for 10 years. The court decided it was in the child's best interest to place custody with the maternal grandfather, with whom the child had had close contact during that time.
In Pierson v. Bloodworth (1980), 81 Ill. App.3d 645, 401 N.E.2d 1320, custody was also awarded to the nonparent. However, the court cited facts which clearly made it in the children's best interest to be in the custody of the stepmother/aunt: one child's poor performance in school while staying with the mother, the frequent and violent quarreling between the mother and her husband, the negative effect that would come from uprooting the children from the social ties they had established while living with the nonparent, and the children's expressed preference to live with the nonparent. The Pierson court said that these constituted "compelling reasons" justifying the trial court in awarding custody to the nonparent. (81 Ill. App.3d 645, 652, 401 N.E.2d 1320, 1325.) Similarly, the court in Soldner v. Soldner (1979), 69 Ill. App.3d 97, 102, 386 N.E.2d 1153, 1157, required that there be "convincing grounds" for custody to go to a nonparent. In Sholty v. Sholty (1966), 67 Ill. App.2d 60, 64-65, 214 N.E.2d 15, 17, the court said that "other circumstances" may in some cases be sufficient to overcome a parent's right to custody.
Thus, we are faced with the question whether there were "convincing grounds," "compelling reasons," or "other circumstances" that justified the trial court in placing Christy with her half-sister instead of with her father.
We cannot, of course, ignore the fact that this case is an unparalleled *297 one with facts that can hardly be duplicated. Our task, however, is to look at the evidence presented at trial and determine whether the decision to grant custody was against the manifest weight of that evidence, considering the fact that the father here can be deprived of custody only if there are compelling reasons for doing so. (Garrison v. Garrison (1979), 75 Ill. App.3d 726, 394 N.E.2d 788.) The trial court considered the effect the custody might have upon Gary's son, Alan. However, no evidence was presented which would suggest that the two children would be unable to have a successful relationship. We are not unmindful, of course, that placing custody with Gary Townsend would require that Alan live in the same home with a girl whose mother had killed Alan's own mother. However, there was considerable testimony at trial concerning Alan's successful adjustment to the fact that his mother had been killed, and we find nothing in the evidence suggesting that he would be upset by Christy's presence. Thus, Alan's situation is not a compelling reason for placing custody with Brenda.
The child psychologist testified that if Gary were to be given custody he should not be required to take Christy to visit her mother, Dorothy, in prison. He was of the opinion that hostility between Gary and Dorothy would have a negative effect on Christy. We do not see, however, why visits with Dorothy would be precluded if Gary has custody. George and Dorothy apparently have remarried at this time, and if George's and Brenda's affection for Christy is as strong as was suggested at trial, then surely they will be willing to take the responsibility of seeing that Christy and her mother are able to meet periodically. In addition, Gary expressed a willingness at trial to cooperate in any court order requiring him to allow Christy to visit Dorothy. Thus, Christy's need to maintain contact with Dorothy is not a compelling reason to give Brenda custody. That contact can be adequately continued if Gary has custody.
A factor of some importance in this case is the long-term relationship that has developed between Christy and Brenda, who has in effect been her custodian practically since birth. In addition, Christy apparently has a close relationship with her niece, Courtney, who is the same age as Christy. In Look v. Look (1974), 21 Ill. App.3d 454, 458, 315 N.E.2d 623, 626, the court said:
"To sever home ties of long standing as here where the child has lived with the grandparents almost all of his life, a home full of love and care, for the sole purpose of placing him with his father cannot be said to be in the best interest of the child."
See also Barclay v. Barclay (1978), 66 Ill. App.3d 1028, 384 N.E.2d 564; In re Ross (1975), 29 Ill. App.3d 157, 329 N.E.2d 333.
In this case, Gary Townsend began seeking custody of Christy when she was 2 1/2 years old. At the time of trial, she was 3 years old, and at the *298 time this case was argued before our court she was almost 4. We think, however, that Christy's attachment to her environment should be considered only as of the time when Gary first sought custody. To look at the facts at some point thereafter would encourage a litigant with custody to delay trial in order to build up longstanding ties. At the age of 2 1/2, a child has not achieved such attachment to his environment and those around him that a change in custody would necessarily be devastating. The evidence in this case did not indicate otherwise.
 3 Because the record shows no compelling reason why custody should not be placed with the natural parent, we reverse the trial court's grant of custody to Brenda Poling, and remand with the direction that custody be granted to Gary Townsend.
Reversed and remanded.
CRAVEN, J., concurs.
Mr. JUSTICE GREEN, dissenting:
Even if Christy's situation is viewed as it existed when the instant petition was filed and Christy was 2 1/2 years old, the court could have concluded from the testimony of Dan Kiley, Sharon Reynolds, and Brenda Poling that Christy had been well cared for and was happy in Brenda's custody. The viability of this arrangement could have been considered to have been proved. The viability of her living with her father would necessarily have been subject to some uncertainty. The trial court could also have believed the testimony of Dorothy Salmons that petitioner had not given her money to care for Christy and that when he visited her he paid little attention to the child. In view of this evidence, a finding by the trial court that Christy's best interests would be served by remaining in Brenda's custody would not have been contrary to the manifest weight of the evidence.
The follies of both of Christy's parents created this most unusual situation. As regards petitioner and his family, she is a child born out of wedlock to the father of the family and the child of a woman who murdered the original mother of the family. Concern as to how she might adjust to living under those circumstances is justified. Concern as to how she might retain her relationship with her mother while living in that family is also justified. I deem this situation to constitute compelling reasons why a trial court that could properly determine that the child's best interests would be served by permitting her to remain in the custody of her half sister could also properly determine that the natural rights of her father to her custody should be denied.
For the foregoing reasons I would affirm the trial court.