THE PEOPLE *ex rel.* JAMES G. RATHBUN, Petitioner-Appellee, *v.* PATRICIA A. RATHBUN *et al.,* Respondents.—(PATRICIA A. RATHBUN, Appellant.)

Fourth District   No. 13416

Opinion filed May 9, 1977.

Reno, O'Byrne & Kepley, of Champaign, for appellant.

David V. Munnis, of Champaign, for appellee.

Mr. JUSTICE BARRY delivered the opinion of the court:

This appeal involves a change of child custody case. The case was initiated by James G. Rathbun, the father of the two children sought, on a petition for a writ of habeas corpus in the Circuit Court of Champaign County. This petition sought the modification of a Colorado decree of divorce which granted custody to Patricia A. Rathbun, the children's mother and one of the respondents. The other respondent was Abdul Jamal, her boyfriend. After hearing evidence, the trial court found for the petitioner and ordered that custody of the parties' minor children, James Russton (Rusty) and Alisha Christine, be granted to the petitioner. The respondent, Patricia A. Rathbun, appealed from this order.

The Rathbuns separated in late 1972 and obtained their uncontested divorce in July 1973. Immediately prior to the divorce, the respondent and the children moved to Urbana, Illinois, to reside with the petitioner's parents. The respondent was recovering from major surgery which she

had in early June 1973, involving a tubular pregnancy, a tubular ligation and an appendectomy. Although the respondent had applied for welfare while in Colorado, she was working for her father-in-law at the time of the divorce. The wages she received were reduced in return for her in-laws allowing her and the children to reside with them.

In September of 1973, the respondent and her children moved to Champaign, Illinois, to reside with her ex-father-in-law's sister, Mildred Rathbun. And in November, they moved to a residence in Urbana; the respondent worked at Jones Optical in Champaign and utilized Mildred as a babysitter for the children. Furthermore, using Mildred's address, the respondent was able to have Rusty attend the Bottenfield School.

On Christmas Day, 1973, the respondent met Abdul Jamal at a Christmas Dinner given in the home of Mildred Rathbun. Jamal was a child welfare worker with the Department of Children and Family Services for the State of Illinois and had both a social and professional relationship with Mildred Rathbun. After their meeting, Jamal and the respondent began seeing one another regularly. During the months of February, March, and April of 1974, Jamal used her car regularly in his work. He would pick up the respondent and her children in the morning at their apartment and take the mother to work and the children to the babysitter. He would then pick them up in the evening and return them home. They would eat supper together regularly during this period of time and occasionally would have lunch. Jamal often would take the children to the park or to the University of Illinois. He stayed overnight at the respondent's apartment from two to five occasions, and on at least two occasions the children were present. In addition, Pat Rathbun and Jamal would go shopping together and plan meals, purchase clothes and shoes for the children, occasionally do the wash and household cleaning together, along with discussing and putting into operation discipline for the children. Jamal testified that he reimbursed the respondent at the rate of $10-12 per week for the groceries he ate in her home during the period May to September 1974, but he also testified that in September 1974 he had not paid the respondent anything for groceries during the previous three months. Jamal further testified that in the three months previous to September 1974, he had paid $50 to $60 on the respondent's doctor bills. At Jamal's suggestion, the respondent and her children began attending church at the Church of Christ. She accepted the teachings of the church, became a member, and attended every Sunday and Wednesday nights during the week, along with Jamal and the children.

In July of 1974, the petitioner remarried. He and his wife presently reside in Harvard, Illinois.

Rusty Rathbun, the minor son of the parties, has a congenital birth

defect, a deformed right foot and shortened right leg. While the parties were still married and in Colorado, he had received treatment and surgery on the foot beginning in January 1966, and continuing through sometime in September 1972. The later treatment consisted solely of examinations and some X rays at a clinic for crippled children held every three months in Colorado. These examinations were conducted by Dr. James Johnson. From January 1966 to January 1972 the leg length difference between the left and right leg of the boy was approximately one-quarter inch. No measurements of the leg length difference were again taken until October 1974, when the leg length difference was measured to be 1 3/4 inches. Because of the birth defect, the boy's right foot turned inward. Since the September 1972 visit to the doctor and up until the time of the divorce decree in July 1973, the boy had not been taken to any doctor for attention for this deformity, nor to any crippled children clinic. After the parties had separated, the respondent had complained that she had no means of transportation and the petitioner made his car available to her, but nevertheless the boy did not see a doctor again in Colorado prior to the entry of the divorce decree.

After the parties were divorced in July 1973, and the mother and children had come to Illinois, the minor son of the parties was still not thereafter taken to see a doctor. The respondent and Jamal had discussions about the boy's condition and Jamal obtained papers or forms from the Crippled Childrens Association at the University of Illinois, whose office was in the same building where the Department of Children and Family Services was located. The Crippled Childrens Association was contacted in late June or early July 1974, and an appointment made, and a caseworker assigned, concerning Rusty Rathbun.

While the parties were still in Colorado, the doctor had directed that lifts be placed in the right shoe of the boy to correct the inward turning of his foot. This was never repeated in subsequent purchases of shoes, either in Colorado or in Illinois. Rusty Rathbun wore a different size shoe on his left foot than his right foot because the deformed foot was smaller. He would wear shoes out quickly, requiring new shoes approximately every three months. Although he limped because of the leg length difference, this did not interfere with his normal activities at play with friends, nor did it seem to affect the mental attitude of Rusty although on occasion he would complain or use it as an excuse.

Julia Johnson, Rusty's teacher the previous year at Bottenfield School, testified that the boy was normal in all respects of his education in that he was not habitually truant, and had a good attendance record, he was not exceptionally tardy, he was not aggressive or disruptive, nor was he overly shy or withdrawn. She described his learning ability as within the

average range. Late in the school year she discovered that he had a deformed foot when he pointed it out to her. During recess or other contact with children, the foot did not handicap him.

In May 1974, Pat Rathbun had surgery in Champaign for gallstones. She was off work from Jones Optical for approximately eight weeks and received sick pay during that time. After her recuperation, however, she did not return to work at Jones Optical. She was unemployed for a short period of time until she became employed at a K-Mart department store. After her surgery, she also ceased taking the children to Mildred Rathbun. On August 18, 1974, she moved to 1604 South Vine, Urbana, and thereafter she obtained a new babysitter who was a neighbor.

On August 17, 1974, the petitioner and his wife were returning the children after visitation. When they arrived at the Illini Union, University of Illinois campus, they discovered that the respondent had the car fully packed and Jamal was with her. When some mention was made of going to Arkansas, the petitioner refused to return the children and took them back to Harvard, Illinois, with him. On August 21, 1974, the petitioner filed his petition for a writ of habeas corpus. In addition to a motion to dismiss, the respondent filed a cross petition for habeas corpus, seeking to regain custody of the minor children of the parties pursuant to the Colorado divorce decree. Custody was temporarily returned to the respondent at a hearing held August 27, 1974.

On the next hearing date, October 21, 1974, Dr. James A. Johnson testified concerning his contacts, examination and treatment of Rusty. Dr. Johnson testified that the boy's deformity was a major deformity which, due to the circumstances, including particularly the congenital shortening of the right leg, would require continuous observation and treatment as it could be expected that the leg-length discrepancy could increase and the deformity of the foot could also increase or change in spite of existing treatment, and that in such congenital deformities there must be continual observation in order to apply other modes of treatment that might be necessary. Dr. Johnson stated that he advised Patricia Rathbun of the necessity of such continuous observation and treatment of Rusty's leg and foot in the period from 1966 to September 1972. In the period 1966 to September 1972, Dr. Johnson did in fact at regular intervals observe and treat Rusty in Colorado. With respect to the deformity, Dr. Johnson testified that in 1966 the deformed right foot turned in significantly and the right leg was one-quarter of an inch shorter than his left leg. In January of 1972, the latest X rays which he took of Rusty revealed the growth line in the right leg open but being pretty close to being closed and that at that time he didn't notice any increase in the shortening of the right leg as compared to the left.

In his treatment of Rusty's foot in Colorado, Dr. Johnson testified he

originally placed casts on the right foot to correct the turning in and then ordered some corrective shoes to be used with a lift and hard, firm counter to the shoe to maintain or help maintain the correction. He stated he advised the respondent of these corrective shoes on January 28, 1971.

Dr. Johnson's further testimony revealed that he had that morning examined Rusty's right leg and foot and found that the shortening of the deformed right leg of the boy had increased to approximately 1 3/4 inches in length and had decreased in width approximately one inch as compared to the normal left leg. He also discovered that the toe of the deformed right foot turned in about 45 degrees and the foot itself turned in about 20 degrees and that such turning in of the toe and foot was more than in September 1972. He testified that the outside of Rusty's ankle was very prominent and it's obvious when he walks barefoot that the right leg is quite a bit shorter than the left, with the boy also walking with some external rotation of his right leg to correct the turning in of his foot. He found that, at the time of the examination, the boy was wearing different size shoes with the left heel of the larger shoe being higher than the right, which was not to the advantage of the foot in view of the shortening of the right leg.

In Dr. Johnson's opinion, the whole lower extremity of Rusty's right leg has deteriorated significantly since he last examined the boy in September of 1972. In the period in which the growth of the leg resulting in the length difference was occurring, the boy should have been under observation and advantage taken to reduce the difference in leg length. Since such leg equalization had not occurred, Rusty had been harmed significantly and medically neglected. Dr. Johnson emphasized that a case such as Rusty's, involving the congenital defect and leg differential, is more difficult to predict and treat than other leg inequalization cases, since one would expect and have to make an assumption that there may be other abnormalities in other systems, particularly the circulatory system, and that that is why he had advised continuous observation. On cross-examination he further stated that the earlier one gets to a congenital problem such as Rusty's the better the result is, and to delay it longer would probably require a longer period of time of treatment with less benefit. He then stated he thought Rusty should undergo surgery as soon as possible.

After September 1972, the respondent failed to take Rusty to a doctor, either in Colorado or Illinois. She did, however, purchase for Rusty different size shoes, a smaller one for the deformed foot and a larger size shoe for the left foot. She testified that during this period Rusty's deformity remained about the same and denied that Dr. Johnson advised her of the necessity of continuous observation and treatment of Rusty's deformity, stating that Dr. Johnson had just simply told her she should buy different size shoes for Rusty without the need for any lifts or inserts,

but admitting on cross-examination that shoes with lifts were once ordered for Rusty in Colorado.

The petitioner testified that Dr. Johnson had advised the parties in Colorado of the need for continuous observation and treatment of Rusty's deformity, that in accordance with Dr. Johnson's orders, two pair of special shoes with custom-built lifts in the soles and heels were purchased and worn by Rusty in Colorado, that such corrective shoes had helped place the turning in of Rusty's right foot almost to a straightened position. The petitioner also testified that, after the separation, he asked the respondent whether she was continuing treatment for Rusty, but had not taken Rusty to a doctor himself because the respondent would have to request the records from Dr. Johnson.

Jamal testified that he talked with the respondent about taking Rusty to Illinois Crippled Children Service, that he picked up some blanks for the respondent to apply to Crippled Children Service in about the middle of the summer of 1974, that he and the respondent talked about sending for the medical records from Colorado but that as far as he knew rather than sending for the records from Colorado, the respondent telephoned Crippled Children. Jamal stated he was requesting the defendant to get the medical records from Colorado in order to increase the chances of getting an appointment for Rusty with Crippled Children Service. Otherwise it takes months before people get an appointment with Crippled Children's Service.

Mildred Rathbun testified that she once called the Crippled Children Service to find out how they worked because Rusty was showing more limp than he had in the summer of 1973. This call was made in January of 1974. Mildred told the respondent how to contact the Crippled Children Service, but the respondent told her that there was nothing more which needed to be done. Following this first discussion with the respondent, three similar discussions were had in the spring of 1974.

In addition, the trial court appointed Donald T. Shannon, a clinical psychologist, to interview the parties and all persons involved in the controversy and present some recommendations to the trial court. The parties agreed to consult Dr. Shannon and agreed that Dr. Shannon would present a recommendation to the court. However there is a dispute as to whether the parties agreed to stipulate to allowing Dr. Shannon's written report into evidence. Nevertheless, the trial court allowed Dr. Shannon's written report into evidence. Both the written report and Dr. Shannon's testimony indicated that, in his opinion, the petitioner would be able to provide a more stable environment for the children and that the children ought to remain together.

Based on this evidence, the trial court ordered a change of custody. The respondent now appeals.

The first argument presented by the respondent is that either the trial court applied an incorrect standard in determining the necessity for a change of custody or the trial court abused its discretion in changing custody because the evidence failed to prove unfitness of the respondent or changed circumstances. The law relevant to determining the necessity of a change of custody has been summarized in *Rayburn v. Rayburn* (3d Dist. 1977), 45 Ill. App. 3d 712, 713, 360 N.E.2d 142, 144:

> "Under a petition for change of custody, the best interests and welfare of the child are of primary concern to the court. (*Nye v. Nye* (1952), 411 Ill. 408, 105 N.E.2d 300; *Randolph v. Dean* (3rd Dist. 1975), 27 Ill. App. 3d 913, 327 N.E.2d 473). Even though a decree granting custody is regarded as temporary (*Hohendahl v. Steele* (1908), 237 Ill. 229, 86 N.E. 717), changes in custody should not be varied constantly, fluctuating with the health, employment or residence of the party not in custody. (*Randolph v. Dean* (3rd Dist. 1975), 27 Ill. App. 3d 913, 327 N.E.2d 473.) Generally, to justify a change of custody there must be a material change of circumstances adversely affecting the best interests of the child. (*Golden v. Braunfeld* (4th Dist. 1974), 22 Ill. App. 3d 344, 317 N.E.2d 336.) A change of circumstances of only the noncustodial parent may be considered, but it is not sufficient for a change of custody that the changed circumstances affect the parent's situation without affecting the welfare of the child. (*Maupin v. Maupin* (4th Dist. 1950) 339 Ill. App. 484, 90 N.E.2d 234.) Furthermore, once the trial court makes its decision, that decision will be disturbed only if there is an obvious abuse of discretion or the order is contrary to the weight of the evidence. *McDonald v. McDonald* (4th Dist. 1973), 13 Ill. App. 3d 87, 299 N.E.2d 787; *Girolamo v. Girolamo* (5th Dist. 1972), 5 Ill. App. 3d 627, 283 N.E.2d 713)."

Applying the facts of this case to the law summarized in the *Rayburn* case, we are unable to say that the trial court abused its discretion. The failure of the respondent to seek out medical care for her son is a sufficient change of circumstance to warrant a change of custody, especially because there was medical testimony indicating deterioration of the child's physical condition. This adverse effect indicates that a change of custody was in the best interest of the children.

Even though the trial court's order recites, as justification for its change of custody order, "a material and substantial change of circumstances in the stability of environment of the minor children and that it is in the best interests of the minor children that their care, custody, control and education be awarded to the Petitioner," it does not mean that the trial court did not find a substantial change of circumstances adversely affecting the best interests of the children or that an incorrect standard

was applied by the trial court. Assuming *ad arguendo* that the trial court did apply an incorrect standard, we conclude that, after applying the proper legal standards to the evidence in this case, the trial court's decision was not an abuse of discretion.

■■ The respondent contends that the trial court is required to recite its specific findings of changed circumstances, as well as findings of how those changes adversely affect the children. For this proposition the respondent cites no authority. Nor are we aware of any authority which supports the respondent's contention. The law is well settled that, even though a trial court bases its decision on an improper ground, the reviewing court's function is to determine the correctness of the result, not the correctness of the trial court's reasoning. *People v. York* (1963), 29 Ill. 2d 68, 193 N.E.2d 773; *People v. Zimmerman* (1st Dist. 1965), 57 Ill. App. 2d 190, 206 N.E.2d 741.

Lastly, the respondent asks this court to consider the propriety of the trial court's use of the psychologist's report. The general rule throughout the United States appears to be that, where the parties consent to, or acquiesce in, the trial court's use of an independent investigation, the trial court may. consider the investigation without requiring that the investigation comply with the rules of fair trial. Annot., 35 A.L.R.2d 629 (1954).

In this case, the parties agreed to consult with the psychologist and agreed that Dr. Shannon would present a recommendation to the trial court. Therefore, the appointment of Dr. Shannon to conduct the interviews was not reversible error on the part of the trial court.

■■ The only dispute is whether the parties agreed to accept Dr. Shannon's written report into evidence. The respondent now objects to the admission of the report because the report included hearsay. We believe the respondent has waived this issue. By agreement of the parties, the psychologist interviewed only those persons who were interested in this case, and who were witnesses. Every person interviewed by Dr. Shannon had either been called as a witness or was available to be called as a witness, and therefore could have been examined in court concerning any statements made to Dr. Shannon. In fact, only the children were not called as witnesses. In addition, Dr. Shannon was called as an adverse witness by the respondent and was cross-examined by the respondent concerning the psychologist's report and recommendations. Furthermore, the respondent did not make a motion to strike any portion of the report, nor did the respondent object on any of the several occasions the trial court brought up the subject of Dr. Shannon's report. For these reasons, the respondent's objection to the hearsay nature of Dr. Shannon's written report is deemed waived.

■■ The final contention of error is that the psychologist's

recommendations were not based on the same legal standards that the trial court was required to apply to the evidence in this change of custody case. Although we agree with the respondent that the findings of the psychologist alone would probably not be an adequate basis for a change of custody case, Dr. Shannon's psychological evaluation was merely another circumstance to be considered in the case. Once the trial court has all of the evidence before it, the proper legal standard must be applied to that evidence. There is no evidence the trial court relied solely on the psychologist's report. Since we have already determined that the aggregate of the evidence supports the conclusion of the trial court, we find no error on the part of the trial court in considering the psychologist's report.

Accordingly, the judgment of the Circuit Court of Champaign County is affirmed.

Affirmed.

STENGEL and STOUDER, JJ., concur.