STEPHEN W. CEBRZYNSKI, Plaintiff, *v.* PATRICIA ANN CEBRZYNSKI, Defendant-Appellant.—(MARY ANN CEBRZYNSKI, Intervening Petitioner-Appellee.)

First District (4th Division)   No. 77-634

Opinion filed July 27, 1978.

Herbert A. Glieberman and Jerome Marvin Kaplan, both of Chicago, for appellant.

William R. Jacobs, II, of Jacobs, Camodeca & Timpone, of Chicago, for appellee.

Mr. JUSTICE ROMITI delivered the opinion of the court:

In this appeal we must determine the validity of a trial court order granting joint and mutual custody of three minor children to their natural mother and their stepmother, but also granting actual physical custody to the stepmother alone, with visitation rights to the natural mother. Both mothers were held by the trial court to be fit parents, and on appeal, the natural mother contends that without a finding of her unfitness she had a right as a matter of law to custody.

We affirm the trial court's decision.

The defendant-appellant, Patricia Ann Cebrzynski (Patricia), married the plaintiff, Stephen W. Cebrzynski (Stephen), in August 1965. They had three children, Michael, born August 18, 1966, Andrew[1], born July 31, 1968, and Paul, born November 15, 1970. On February 23, 1973, Patricia and Stephen were divorced, with the decree incorporating their agreement that Stephen be awarded custody of the three minor children, subject to review in one year. On April 14, 1973, Stephen married Mary Ann Cebrzynski (Mary Ann), the intervening petitioner. Stephen died

---

[1] In October 1971 Andrew was placed in an institution for the mentally retarded. He was still institutionalized at the time of the hearing.

November 5, 1975. On December 5, 1975, Patricia filed a post-decree petition seeking custody of the children. The court first entered an order on that date granting custody to her, but then vacated the order the same day, finding that no hearing had been held, and set the cause for a hearing on December 8, 1975. On December 8 an order was entered permitting Michael and Paul to continue to reside with Mary Ann from 5 p.m. Sunday to 5 p.m. Friday and with Patricia the remainder of the week. Subsequently Mary Ann petitioned for custody of the children and was granted leave to intervene in the cause. Following evidentiary hearings on the matter the trial judge granted joint and mutual custody to Mary Ann and Patricia, with actual physical custody to Mary Ann and visitation rights to Patricia. This appeal followed.

No significant factual disputes arose from the testimony, which we summarize in pertinent part. Patricia, 32 at the time of her testimony, was employed in a training position with the Will County Health Department at an annual salary of $10,000. She received a bachelor's degree in education from Northern Illinois University and was four hours short of a master's degree from Governor's State University. Until September 1972 Patricia lived with her husband and children in an apartment in Park Forest, Illinois. She moved out of the marital residence that month into an apartment a few blocks away. In January 1971 Patricia met Mary Ann, who had known her husband since the previous September when she met him at the high school at which they both taught. Mary Ann agreed to babysit for Patricia's children for about a week that month while Patricia underwent an operation. After Patricia moved out of the marital home the children remained with Stephen, but they came to her apartment after school until bedtime every weekday and were there much of the weekends. Following the divorce she had visitation rights with the children on weekends. She did not seek to modify the custody decree at that time because she was working nights and was single. When Stephen remarried, she began to see the children on alternate Saturdays and Sundays. Once a month they would customarily stay overnight with her. After Stephen's death she had the children every weekend from 5 p.m. Friday to 5 p.m. Sunday. Patricia planned to marry a police officer in November 1976. (In her petition for rehearing before the trial court she stated that she did marry then.) She testified to her belief that on their combined incomes she would be able to support her three children if she received custody of them. She had recently purchased a single-family home. Patricia conceded that Michael had been very disturbed about living permanently with her.

Mary Ann testified that she worked as a teacher in a high school at a salary of about $17,300 a year including payment for teaching summer school. She had a seven-year-old daughter from a previous marriage

which ended in divorce. She met Stephen in September 1970 when she began teaching at the high school where he taught and first became "romantically involved" with him about two years before his divorce from Patricia in February 1973. When Patricia moved out in 1972 Mary Ann began to participate in the care of the children on a regular basis. Stephen would bring Paul over to Mary Ann's apartment in the morning. She would feed Paul breakfast, bathe him, and take him to the same babysitter she used for her daughter. After she was through teaching school she would take Paul to Patricia's apartment for the evening. Before Patricia moved out, in the period between January 1971 (when Mary Ann babysat for the children evenings from 5 to 10 for about a week), and September 1972, Mary Ann only visited Stephen's home a few times. But Michael was in her apartment at least once a week when Stephen brought him over, and often Paul would come too. The children did not spend the night on those occasions. Mary Ann moved into the apartment formerly occupied by Stephen and Patricia when she married Stephen. In October 1973 they moved to a home in Crete, Illinois, and in July 1976 they moved to a home in Orland Park, Illinois. Michael and Paul each had his own room in that home. Mary Ann also testified that as the widow of Stephen she was entitled to receive payments under a pension plan. She could elect to receive a lump sum of about $15,000 or, if Stephen's children were living with her, she could receive $500 a month until Michael turned 18, and then $260 a month until Paul turned 18. Acceptance of the lump sum would waive any further claim on her part.

Patricia's father and two of her friends, including her fiance's sister, all testified that they had observed her with her children and knew her to be a very fit mother who cared for her home and children properly. All expressed their opinion that Patricia should have custody.

Stephen's parents, his sister and her husband, and a friend of Mary Ann's, Arleen Morgenti, all testified that they had observed Mary Ann with the children. She cared for them well, was a fit mother, and should get custody.

David Nilsson, a case worker with the Department of Supportive Services, visited Mary Ann and Patricia in their homes and also talked with Michael. He found both women to be good housekeepers and found them both to have a very stable physical environment. Nilsson's recommendation was that the children remain with Mary Ann, though his reasons for that were not elicited because of objections from counsel.

Arthur Berman, the guardian ad litem for the children, interviewed Michael, Paul, and both mothers as well as some of their friends and relatives. He explicitly refrained from relating what preferences, if any, the two boys had with respect to custody. Berman indicated that he felt neither woman was unfit to care for the children. He found that Patricia

was an intelligent woman, very concerned with her children, who honestly believed she would be best for them. He found that Mary Ann was concerned with the best interests of her children, not what was best for herself; he believed her to have a close relationship with the children. It was his opinion that the children would be better off with Mary Ann:

> "* * * for many reasons, and part of them are psychological from reports that I have read and so forth, I feel that the children would be better off with Mary Ann. I feel she is able to devote more time to them and respond to them now, to their best interests, better than Patricia is at this time. But I don't want the Court to feel in any way that I am castigating Patricia for any—remember, she hasn't had the children since the divorce, and it's much more difficult to relate the children [*sic*] when they come to visit you each week than it is when you have them there every day. In all fairness to her, I have to say that this does go into the basis of my opinion."

Dr. Walter Feldman, an attorney and a psychiatrist, interviewed Mary Ann, Michael, and Paul. He sought an interview with Patricia but she refused on the advice of counsel, according to her testimony. Tests on Michael and Paul were run under Feldman's supervision and observation. He concluded that Paul was suffering from depression caused by his father's death and by the potential disruption of his home environment flowing from the custody dispute. In a written report which was also submitted to the court (the report was prepared for counsel for Mary Ann) Feldman stated that another separation would constitute a danger to Paul's future emotional health. In that report he stated that Michael, who had a superior IQ, had remarkable potential, and had an excellent relationship with Mary Ann. But if there was "further trauma," he could withdraw even more than he had. Michael told Feldman that if custody were changed, he would return as soon as he obtained the legal right. In his trial testimony Feldman expressed the opinion that it would be in the best interests of the boys that they remain with Mary Ann. He also concluded that a change of physical custody would be potentially very dangerous and hazardous, even if both mothers were equally fit.

In reaching his decision, the trial judge made the following comments:

> "Ladies and gentlemen, this has been a terrible decision, but we had to do it and we have done it and done what we think is right. In reading the cases and deciding this case, I had to think of what is the best interests of the children. I have concluded that I think the best interests of the children will lie in Mary Ann Cebrzynski. She is going to have custody—no, it's going to be joint and mutual custody, but they are going to live with Mary Ann Cebrzynski. She is going to be the live-in custodial parent, but we are going to give Patricia, whom we did not find unfit, whom we found nothing

wrong with except when you have two things, you take what you think is the best, and the testimony was that Mary Ann will probably be the better parent.

I don't know if I'm making a mistake on that, but I have to rule it that way and it's going to be subject to review in the middle of August next year * * * I don't find either one of these people reprehensible at all. I find both these people good people, and it's a terrible decision for me to make * * * I didn't know what I was going to do here until last night or so."

In his final order the trial court specifically found that Patricia Ann Cebrzynski and Mary Ann Cebrzynski were both fit and proper persons to have the care, custody, control and education of the minor children. On appeal Patricia contends that as the natural mother of the children her right to custody could be overcome only upon a showing that she was unfit. In the alternative, she contends that no showing of any of the other compelling reasons for depriving a natural mother of custody was made under these facts.

■■■ Patricia incorrectly states the holding of *Eaton v. Eaton* (1977), 50 Ill. App. 3d 306, 365 N.E.2d 647, to be that a person seeking custody of minor children over a surviving parent has the burden of proving that the natural parent is unfit to have custody. That case involved a custody dispute between the natural mother and the child's grandparents. The trial court awarded custody to the grandparents, based in part on testimony indicating the natural mother worked as a bartender and cocktail waitress in a lounge featuring topless dancers, co-habited for a time with a man, possessed a loaded gun in her apartment for her protection, and smoked marijuana on occasion. That court did not, however, specifically find that the mother was unfit. On appeal custody was awarded to the mother. The court found that the natural mother had overcome earlier difficulties and would provide an adequate home and a loving environment for the children. It held that "[a]bsent a showing of parental unfitness or other good reason, the law presumes it is in the child's best interest to be raised by a natural parent rather than other relatives or outsiders." (*Eaton*, 50 Ill. App. 3d 306, 313, 365 N.E.2d 647, 653.) Because this presumption was not overcome, custody was awarded to the natural mother even though the grandparents were found to have provided the children with a "stable home environment, financial security, and love and affection." (*Eaton*, 50 Ill. App. 3d 306, 312, 365 N.E.2d 647, 652.) The court in *Eaton* recognized that in Illinois it is well established that "[t]he best interest of the child is the standard and it is not necessary that the natural parent be found unfit or be found to have legally forfeited his rights to custody, if it is in the best interest of the child that he be placed in the custody of someone other than the natural

parent." (*People ex rel. Edwards v. Livingston* (1969), 42 Ill. 2d 201, 209, 247 N.E.2d 417, 421; *Giacopelli v. Florence Crittenton Home* (1959), 16 Ill. 2d 556, 158 N.E.2d 613.) But those cases also recognized and explicitly stated that a natural parent has a superior right to the custody of his child, though that right must yield to the best interest of the child. (*Giacopelli; Edwards; Look v. Look* (1974), 21 Ill. App. 3d 454, 315 N.E.2d 623.) That right is also recognized by statute in Illinois, a statute relied on in *Eaton*:

> "When both parents of a minor are living and are competent to transact their own business and are fit persons, they are entitled to the custody of the person of the minor and the direction of his education; and, if one parent is dead and the surviving parent is competent to transact his own business and is a fit person, he is similarly entitled. The parents have equal powers, rights and duties concerning the minor. If the parents live apart, the court for good reason may award the custody and education of the minor to either parent or to some other person." Ill. Rev. Stat. 1975, ch. 3, par. 132, repealed effective January 1, 1976, but replaced on the same effective date with almost identical language by Ill. Rev. Stat. 1977, ch. 110½, par. 11—7:

> "If both parents of a minor are living and are competent to transact their own business and are fit persons, they are entitled to the custody of the person of the minor and the direction of his education. If one parent is dead and the surviving parent is competent to transact his own business and is a fit person, he is similarly entitled. The parents have equal powers, rights and duties concerning the minor. If the parents live apart, the court for good reason may award the custody and education of the minor to either parent or to some other person."

*Eaton* followed established precedent when it found that the right granted in this statute must yield where good reason was shown for granting custody to another. *Edwards*.

■■ However, it is clear from a review of the cases in which custody was awarded in derogation of this right that a compelling reason must be shown demonstrating why the natural parent should not have custody. Thus in *People ex rel. Kuhn v. Weeks* (1923), 228 Ill. App. 262, an aunt received custody instead of the natural father who had given his child for care to the aunt when the child was two, left her there for ten years during the last seven of which he only saw her about three times a year, and only after that time attempted to get custody. In *Giacopelli*, adoptive parents received custody of a child only a few months old where the natural mother placed the child for adoption at birth and was held to have given up her right to it and the father showed no interest in the welfare of the mother, failing even to show any concern when she did not return to the

home for six weeks after the baby was due, and where the father also had a lengthy criminal record including some 26 arrests. In *Edwards* a grandfather received custody where the natural father deserted his family, never made court ordered payments for support of the child, and never visited the child for 11 years up to the time of the death of its mother, even though he only lived 30 miles away at the most during that time. In *Mackie v. Mackie* (1967), 88 Ill. App. 2d 61, 232 N.E.2d 184, a grandmother received custody instead of the natural father where the mother had left the home four years before her death during which time the father never visited his daughter. In *Look v. Look* (1974), 21 Ill. App. 3d 454, 315 N.E.2d 623, the natural parents were divorced, with custody in the wife. She left their son for five years with his grandparents. The father was held to have acquiesced in this and was found to have no close association with the son. The court indicated that a laches or forfeiture situation existed and awarded custody to the grandparents. Finally in *In re Ross* (1975), 29 Ill. App. 3d 157, 329 N.E.2d 333, a trial court decision granting custody to the natural parents was reversed and remanded for a new hearing where the two children were removed from their natural parents at the ages of 5 and 4 because of physical and emotional neglect and a poor family situation. They spent the next 6½ years with the foster parents who also sought custody and at the time of trial both girls indicated a strong desire to remain with those foster parents. The case was remanded only because while the appeal was pending the girls indicated they might be changing their minds at least about not wanting to see their natural parents. In none of those cases were the natural parents determined to be unfit, but other compelling reasons were established for not granting them custody. Similarly in the case at bar, although the natural mother was found to be a fit parent, the trial judge was presented with testimony which provided a compelling reason for not granting actual physical custody to her. Dr. Feldman testified that on the basis of the tests and interviews conducted with Paul, Michael and Mary Ann he believed that a change in actual physical custody would be damaging to the children's emotional health. Patricia in her testimony conceded that Michael had been very disturbed about the prospect of living permanently with her. The trial court did not specifically refer to this testimony in making its decision, but neither did it reject it. Certainly one factor which a court may properly consider in a custody case is stability of environment for the children. (*Cave v. Cave* (1971), 2 Ill. App. 3d 782, 276 N.E.2d 793; *Holloway v. Holloway* (1973), 10 Ill. App. 3d 662, 294 N.E.2d 759.) At the time of the trial court's decision Paul and Michael had been living with Mary Ann for almost 3½ years, although Patricia had exercised her visitation rights regularly during that time. The trial court heard the testimony of Dr. Feldman indicating that a change in this

environment would be potentially hazardous to the children even if both mothers were equally fit.

■■ In custody cases great discretion must be vested in the trial court because it has the superior opportunity to evaluate the evidence and determine the best interests of the children. (*Gren v. Gren* (1978), 59 Ill. App. 3d 624, 375 N.E.2d 999; *Marcus v. Marcus* (1974), 24 Ill. App. 3d 401, 320 N.E.2d 581.) The trial court's determination of custody rights will be reversed only if it has clearly abused its discretion or if the decision was contrary to the manifest weight of the evidence. (*People ex rel. Rathbun v. Rathbun* (1977), 48 Ill. App. 3d 328, 362 N.E.2d 1136; *Sorenson v. Sorenson* (1973), 10 Ill. App. 3d 980, 295 N.E.2d 347.) The record in this cause establishes that the experienced trial judge carefully exercised his discretion with full awareness of the importance of his decision to the children and those who sought custody of them. We find no abuse of discretion, nor can we say, based on the record, that the court's decision was contrary to the manifest weight of the evidence. Accordingly that decision will not be disturbed.

The judgment of the trial court is affirmed.

Affirmed.

JOHNSON, P. J.*, and DIERINGER, J., concur.

---

* At the time of oral argument of this case Justice David Linn sat with Justices Dieringer and Romiti. Subsequently Justice Linn recused himself and P. J. Glenn T. Johnson was designated the third member of the panel and has listened to the tape of the oral argument and has read the briefs and record.