THE PEOPLE *ex rel.* BARBARA BUKOVIC, Petitioner-Appellee, *v.*
JAMES SMITH *et al.*, Respondents-Appellants.

First District (2nd Division)    No. 80-3128

Opinion filed June 30, 1981.

Dinah B. Dyer, of Wisch and Dyer, of Chicago, for appellants.

Paul C. Ross and John F. Martoccio, both of Chicago, for appellee.

Mr. PRESIDING JUSTICE HARTMAN delivered the opinion of the court:

James and Lecta Smith, paternal grandparents (hereinafter grandparents or Smiths), appeal from an order entered November 25, 1980, denying their petition for custody of their grandchildren, Anthony and Matthew, now ages 10 and 7 respectively, and requiring the Smiths to return the children to their natural mother, Barbara Bukovic (hereinafter mother or petitioner). Custody of the children had originally been awarded to the mother under a "judgment for divorce" entered July 15, 1977. The children have lived with the grandparents since approximately September 1, 1977. The issues presented for review are whether: (1) the criteria of section 610(b) of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1979, ch. 40, par. 610(b)) (hereinafter Act) apply to the grandparents' petition for custody; (2) the relevant factors of section 602 of the Act were considered by the trial court; (3) the mother consented to the integration of the children into the grandparents' family; and (4) the trial court's decision that it was in the children's best interests to be returned to the mother was contrary to the manifest weight of the evidence. We affirm for the reasons which follow.

The mother married her present husband, Robert Bukovic, on June 30, 1979. She filed a verified petition for writ of habeas corpus on January 10, 1980, which alleged, *inter alia*, that: petitioner was the natural mother of Anthony and Matthew, who were detained and wrongfully restrained by the grandparents; the mother had been granted custody of her sons by judgment for divorce entered July 15, 1977; the judgment for divorce was never vacated or modified; and, the mother had the right to custody. Following a hearing, the court below entered an order directing the issuance of a writ of *habeas corpus* upon the grandparents commanding them to produce the children in court, which was so issued on January 11, 1980.

The grandparents appeared and filed an answer to the petition in addition to their own petition for custody in which they alleged their relationship to Anthony and Matthew, and that: on Labor Day, 1977, the mother brought them to the grandparents' home and asked them to raise the boys; the children have been in the grandparents' custody continu-

ously from September 1977 until the present, a period of 2½ years; and the mother never previously asked respondents to return the children.

On August 15, 1980, a partial hearing was conducted before an extraordinary remedies court, which thereafter transferred the cause to a domestic relations court. The latter court considered the previous transcript evidence and heard evidence from additional witnesses in October and November, 1980. It granted the mother's *habeas corpus* petition, denied the grandparents' custody petition on November 25, 1980, and denied a rehearing petition on December 15, 1980. This appeal followed.

The evidence adduced at the above-described hearings was as follows. Joyce Scully, of the Illinois Department of Social Services, had investigated both households. She testified that the Bukovics' Sauk Village home contained three bedrooms, including a bedroom for Anthony and Matthew. The household consisted of the Bukovics, Robert Bukovic's daughter from a previous marriage, Leanne, and their nine-month old son, Keith. The infant had been born with a congenital problem for which a public health nurse was needed, but otherwise was well cared for. The nurse had told Scully she was pleased and impressed with the mother's care of the child and felt she was a good mother. The grandparents also have a nice home. The children have their own room, and there is a large yard with a sandbox, tree and swings. Both boys were clean, neat and articulate. They have "all of the things little boys like * * *, a backyard, two little girl cousins next door that they can play with, a sandbox, flowers * * * good relationships with their Sunday school teacher, schoolteachers, a warm atmosphere * * * although it is a little tense when they talk about their mom." She stated there might have been some prejudice implanted against the mother by the grandparents, since Anthony quoted his grandparents about her. Matthew stated he wanted to see his mother more often.

Scully was of the opinion that petitioner is a good mother to her infant, and to Leanne, and is capable of being a good mother to her sons. Because of the past Scully had some reservations about her. The mother told her that she had not been as good a mother as she could have been, but had been very depressed. Counseling had helped, and she believes she has changed. Robert Bukovic was previously married, is hard working, likes children, and is a loving father. Scully had not seen him with the boys. Scully believed that although currently the mother is doing a wonderful job with her family, she should not have custody at this time, since "her change has only been for about two years" and because it would be unfair to uproot the boys from their grandparents. She thought, however, that it would be almost ideal if they could spend four days a week with the Bukovics, and weekends with the Smiths. She also

recommended a reevaluation in one year and that if the mother continued her progress she would be ready to resume full custody.

The mother testified. She is 28 years old. She took care of Anthony from his birth in 1971 until 1977 and of Matthew from his birth in 1974 to 1977. In January, 1977, while married to James Smith, she was involved in an automobile accident as a result of which she suffered injuries to the head, leg and neck. She did not work for 2½ months. Following her divorce in March, 1977, she began to feel "rundown" and increasingly dizzy and weak. On Labor Day of 1977, she asked the grandparents for help with the boys until she could get back on her feet. They agreed to take the children. Between September and December of 1977 the mother was hospitalized twice but was able to contact the boys by phone. After her release from the hospital in December, she wanted the boys with her, but the grandmother suggested they finish the school year (until June, 1978), and she agreed. She continued to see the boys a few times each week. Following June 1978, when she again broached the subject of taking the boys back, the grandparents stated she was confusing the boys by contacting them. During the summer of 1978 they refused to let her speak to or see the boys more than once. She was told they were not home, or were busy. In August 1978, she again stated she wanted the boys, and the grandparents responded that it would be unfair to the boys to disrupt them. In September of 1978, the mother met her present husband and she began to live with him in November of 1978. Thereafter, except for a Christmas visit, the grandparents would not let her take her sons until she was married in June 1979. After encountering more resistance to her regaining the children, the mother contacted her attorney in July, 1979. At that time she was in her fifth month of pregnancy. She and her attorney decided that it would be best to wait until after the pregnancy terminated to pursue this cause.

Elizabeth Carrol, a public health nurse, helped the mother with the care of her baby, Keith, who had a congenital medical problem. She testified that petitioner is an excellent mother, although she did not observe her with Anthony and Matthew.

Robert Bukovic, petitioner's husband, has been a supervisor for Amtrak for six years, after having worked 16 years for the Santa Fe Railroad. His present marriage is his fourth; he has been widowed once and divorced twice. He plans to adopt the children if he has the opportunity, although he has not talked with them about it. To him the only things unusual about the boys were that they seemed withdrawn at first and were untutored in children's activities, such as baseball and swimming. He did not know what school Anthony now attends or in what school activities he participates.

George Martin Popelka, principal of McCord School, attended by

both children, testified that their attendance, grades and conduct are satisfactory. Ronald Aulger, pastor of the First Baptist Church of Burbank, testified that both children are very involved in church activities. Evelyn Ledder, who lives across the street from the grandparents testified they are a close family, loving, good neighbors and good parents. Phyllis Dezre-Maux, the grandparents' daughter and neighbor, testified the boys were well-adjusted, and that they have both told her that they would rather stay with the grandparents on weekends than visit their mother, as the visits upset their routine.

Lecta Smith, the children's grandmother, testified that she is 59 years old, has been married 32 years, raised six children, and is in good health. She does not work outside the home. She and the mother have always been close, and since their birth she has seen and taken care of the children once a week, sometimes for a day or two. On Labor Day, 1977, the mother asked the Smiths if they would raise the boys. Since that time she has seen after the children's day to day needs, attended school conferences, and has taken them camping, horseback riding, sightseeing, and on family vacations. She contended that the mother never asked for the boys back until this action was initiated and never objected to the way the children were being raised. She admitted that the mother called to check on the children in 1977 and 1978 but stated that she was out of contact for five months in the latter part of 1979. She denied ever having prevented her from visiting her children except when she was living out of wedlock with Bukovic.

James A. Smith, the children's grandfather, testified that he is 58 years old and in good health. He is a self-employed mechanic. The boys have never lived any place for more than a couple of months before they came to live with the Smiths. Further, before Anthony came to live with them he had been absent from school for 70 days and had failed kindergarten. The children wanted to stay with them. Anthony had been left with Phyllis, his daughter, to raise when he was a nursing baby and has been bounced back and forth since then. Their father lives nearby. He does not approve of things the mother does, like making false accusations. He would prefer that she not have any visitation rights because of her life-style. He denied speaking against the boys' mother, and stated that in implying that he had the caseworker, Scully, was distorting the truth and putting words in the little ones' mouths.

The court below found that petitioner had never agreed to leave the children in the permanent custody of the grandparents. Thus, the children were never integrated into the Smith family with the consent of the mother, as required to modify custody under section 610 of the Act. The court declared that both households were good, but was concerned that the grandparents had not been "fostering a feeling of warmth" in the

children for their mother, and had never told the children that their mother would be coming back for them. Thereafter, the court determined it was in the children's best interest to be in the mother's custody, denied the grandparents' counterpetition for modification and ordered the children returned to their mother. So as not to tear the children away from their present environment, the court directed that they finish the school term in their present school and provided for shared visitation for the grandparents. The boys will continue to attend their grandparents' church.

■■ The grandparents first contend that the trial court erred in applying section 610(b) of the Act to their petition, which governs modification of custody judgments, and argue that the less rigorous standard of section 602 should govern. That section, like section 610, requires an evaluation of the child's "best interests" but, unlike section 610, section 602 does not call for a demonstration of changed circumstances and the existence of any one of the three conditions precedent set forth therein. (*In re Custody of Iverson* (1980), 83 Ill. App. 3d 493, 496, 404 N.E.2d 411.) By virtue of the fact that the mother was given custody of the children by agreement, the grandparents cite *De Franco v. De Franco* (1979), 67 Ill. App. 3d 760, 765, 384 N.E.2d 997, for the principle that where the initial custody order was based upon oral agreement between the parties and no testimony was heard thereon, the court may use its initial discretion in determining custody under section 602 and it need not apply the more stringent criteria of section 610(b). The court's initial discretion, however, is limited to the issue of changed circumstances, with respect to which the court may hear evidence of facts "unknown to the court at the time of the entry of the prior judgment," the continuity of custody being of priority consideration. (*In re Custody of LaMarca* (1979), 78 Ill. App. 3d 26, 397 N.E.2d 31.) Therefore, whether or not the prior judgment was achieved by stipulation, one of the conditions precedent of section 610(b), embodied in subsections (1) to (3), must be met in order to modify that judgment. Ill. Ann. Stat., ch. 40, par. 610, Historical and Practice Notes, at 95 (Smith-Hurd 1980); *In re Custody of LaMarca*; *In re Custody of Harne* (1979), 77 Ill. 2d 414, 419, 396 N.E.2d 499.

■■ The grandparents argue next that their petition for custody did not request a modification of custody; rather, it commenced a new custody proceeding under section 601(b)(2) of the Act. Once custody has been determined initially, however, any further proceedings must perforce constitute a modification of that judgment under section 610. Moreover, contrary to their suggestion, section 601(b) and 610 are not mutually exclusive since section 601(b) applies to both initial determinations of custody and modification of judgments. Ill. Ann. Stat., ch. 40, par. 601(b)(2), Historical and Practice Notes, at 7 (Smith-Hurd 1980).

■■ The grandparents urge that section 610 applies only to custody matters between or among parties to the dissolutions proceeding, and thus does not apply at bar, where the trial court determined custody for the first time between these particular parties. They cite no authority for this principle, which, if applied, would undermine the Act's goal of finalizing custody judgments. (*In re Custody of Harne.*) The grandparents maintain, however, that where, as here, the custodian has chosen not to retain physical custody of her children, she herself has destroyed the finality of the judgment upon which she relies. We disagree. Such a situation would at most constitute the "change * * * in the circumstances of the child or his custodian * * *" which must be established in order to modify a custody determination pursuant to section 610.

■■ The next assignment of error made by the grandparents is that even assuming section 610 is applicable, the denial of their petition for custody is contrary to the manifest weight of the evidence. They urge that the court erred in finding that the mother did not consent to the integration of the children into their family as required under section 610(b)(2) and that she need not have consented to their permanent custody of the children as the trial court suggested. The mother is said to have manifested the degree of consent required by section 610(b)(2) in having left the boys with the Smiths for an open-ended period of time, persisted in leaving them with the Smiths after three discussions about taking the children back and following visits with the boys, and failed to telephone the boys from July, 1979 to January, 1980. They rely upon *In re Custody of Burnett* (1979), 75 Ill. App. 3d 998, 1000, 394 N.E.2d 58, in which the court held that the consent requirement in section 610(b)(2) is satisfied where the custodian had placed the child with the noncustodial parent and willingly permitted the child to become integrated in the new family. In the instant case, although the mother willingly placed the children with the Smiths, the record does not show that she willingly permitted them to become integrated into their family. The mother testified that, as the result of injuries received in an automobile accident, she initially asked the Smiths to keep the children until she could get back on her feet; she denied having told the grandparents that they could have her sons permanently. In December, 1977, she agreed to let the children finish their school year with them at the suggestion of the grandmother that she get organized with an apartment and the boys would not then be pulled out of school in mid-year. There was evidence that it was the Smiths who became increasingly reluctant to let her speak to the children, not the mother who declined to see or speak to them. *Per contra,* the grandmother testified that the mother asked her to raise the boys and never again asked for the children until she filed this cause. It is within the province of the trial court to determine the credibility of witnesses. (*Mabbatt v. Mabbatt* (1967), 78

Ill. App. 2d 455, 223 N.E.2d 191.) The consent requirement set forth in section 610(b)(2) of the Act is intended to ensure that the custodian acquiesce in the transfer of physical custody as a guard against noncustodial kidnapping and should be viewed within that narrow context. The mother's testimony here was in consonance with her assertion that she did not consent to the boys' integration into the Smiths' household. See generally *In re Custody of Stearns* (1980), 84 Ill. App. 3d 195, 198, 405 N.E.2d 457.

■■ The grandparents contend further that the court's determination that a change of custody would not be in the best interests of the children is unsupported by the evidence. They focus on evidence that: the children are attached to their grandparents; the mother contacted the children infrequently in 1979; she is currently working; and she has a history of instability. Substantial evidence in the record supports the court's finding, however, that the children's interests would be best served if they were in the custody of their mother. She has remarried, is living in a three-bedroom house, and is an excellent mother to the two children presently in her care. The caseworker who testified felt that she was a good mother and contemplated that she should resume physical custody of the boys if she continues to progress. Although the witness also stated that she should not take custody immediately since "her change has only been for two years," we note that past inadequacy or instability on the part of the mother, where there is no indication of probable future difficulties, is not a proper basis for denying custody to her. (*Hendrickson v. Hendrickson* (1977), 49 Ill. App. 3d 160, 163, 364 N.E.2d 566; *In re Custody of Ehr* (1979), 77 Ill. App. 3d 540, 396 N.E.2d 87.) Although the mother is currently working, that fact in itself is not controlling, where both children are in school. (*In re Custody of Blonsky* (1980), 84 Ill. App. 3d 810, 818, 405 N.E.2d 1112.) Moreover, she stated that she will quit her job if she retains custody of the boys. The fact that she called the boys infrequently in the first half of 1979, and did not contact them at all during the second half, under the circumstances shown by the record, are insufficient to overcome the presumption which exists in favor of the appointed custodian. *In re Custody of Harne*.

■■ Finally, the grandparents claim that the children are attached to them and uprooting may be harmful. They insist that a court is not justified in transferring physical custody except for the most cogent reasons, citing *Look v. Look* (1974), 21 Ill. App. 3d 454, 315 N.E.2d 623, *Barclay v. Barclay* (1978), 66 Ill. App. 3d 1028, 384 N.E.2d 564, and *Cebrzynski v. Cebrzynski* (1978), 63 Ill. App. 3d 66, 379 N.E.2d 713. In *Look*, the court awarded custody to grandparents who had taken care of their grandchild for five years while the mother retained legal custody, and declined to modify custody in the natural father's favor. In *Barclay*, the mother

appealed a change of custody from the father to the paternal grandparents, who had cared for the child six years. In *Cebrzynski*, a custody decree was modified by transfer of custody from the natural father, who was deceased, to the children's stepmother (his wife), instead of to their natural mother. In all three cases, the losing party to the custody dispute had never obtained legal custody of the children, although in *Barclay*, actual custody was maintained. The presumption which exists in favor of the legally appointed custodian is thus not lightly overturned. (*In re Custody of Harne.*) Furthermore, in *Look* and *Barclay*, the parents seeking custody did not have a close relationship with their children. In the instant case, the mother placed her children temporarily with the Smiths; asked for their return for the first time in less than one year, not five or six as in *Barclay* and *Look*; reasonably agreed to allow them to finish the school year; continued to seek the children's return thereafter; and remained in contact with the boys, all of which factors support the trial court's decision in this case.

It is true, as held in *People ex rel. Edwards v. Livingston* (1969), 42 Ill. 2d 201, 247 N.E.2d 417, and *Cebrzynski v. Cebrzynski*, that a natural parent's right to raise a child must yield to the child's best interest; however, custody may be awarded in derogation of the right of the natural parent only where compelling reasons for such a disposition are demonstrated. (*Cebrzynski v. Cebrzynski* (1978), 63 Ill. App. 3d 66, 72.) No such reasons have been shown here.

■■ It should be noted that the court's failure to interview the boys was not, as the grandparents suggest, fatal to its determination of the boys' best interests. Although section 602 states that "the wishes of the child as to his custodian" is a factor to be considered in determining the best interests of the child, there was sufficient doubt raised by the evidence as to the influence exerted on the boys by their grandfather for the court to conclude that an interview of the children would not be fruitful, especially in light of their tender years. (*DeFranco v. DeFranco* (1979), 67 Ill. App. 3d 760, 771.) As to the absence of findings, a substantial amount of evidence was heard pertaining to section 602 factors and it was apparent from the court's thoughtful oral ruling that it had taken the relevant evidence adduced into account. *In re Custody of Melear* (1979), 76 Ill. App. 3d 706, 395 N.E.2d 208; *In re Marriage of Ramer* (1980), 84 Ill. App. 3d 213, 218, 405 N.E.2d 401; *In re Custody of Blonsky* (1980), 84 Ill. App. 3d 810, 820.

■■ In custody cases the trial court is vested with considerable discretion because of its superior opportunity to observe the witnesses and evaluate the evidence. (*Gren v. Gren* (1978), 59 Ill. App. 3d 624, 375 N.E.2d 999; *Marcus v. Marcus* (1974), 24 Ill. App. 3d 401, 320 N.E.2d 581.) Its determination is not to be reversed unless it has clearly abused its

discretion or unless its decision is against the manifest weight of the evidence. (*People ex rel. Rathbun v. Rathbun* (1977), 48 Ill. App. 3d 328, 362 N.E.2d 1136; *Sorenson v. Sorenson* (1973), 10 Ill. App. 3d 980, 295 N.E.2d 347.) We find no abuse of discretion or evidentiary error by the trial court, and its order accordingly must be affirmed.

Affirmed.

STAMOS and PERLIN, JJ., concur.