THE PEOPLE *ex rel.* LEON LUTZ, Petitioner-Appellee, *v.* ROBERTA LUTZ *et al.*, Respondents-Appellants.

(No. 73-96;

Second District—January 13, 1975.

RECHENMACHER, J., dissenting.

Covey, McKennery & Powers, of Crystal Lake, for appellants.

James P. Hecht, of Woodstock, for appellee.

Mr. PRESIDING JUSTICE THOMAS J. MORAN delivered the opinion of the court:

Respondents, Anthony and Marian Ferdinardo, appeal from an order of the trial court granting custody of Marian Ferdinardo's granddaughter, Marian Lutz, to petitioner, Leon Lutz.

Mrs. Ferdinardo's daughter, Roberta, married petitioner in 1967. Petitioner adopted Roberta's child, Marian, who had been born in 1966. Another daughter, Dawn, was born of the marriage. The couple separated in 1970, at which time Roberta, with Marian, moved to the respondents' home. In June of 1972, petitioner was awarded a divorce on the grounds of desertion. Both parties being found fit parents, the trial court awarded petitioner custody of Dawn, and Roberta custody of Marian. By terms of the settlement, the parties were made solely responsible for the support of the child placed in their custody. Shortly after the divorce became final, Roberta was killed in an automobile accident. Marian has remained with her grandparents, the respondents.

Subsequent to Roberta's death, petitioner filed a writ of habeas corpus for custody of Marian. Respondents filed a motion in the original divorce proceedings to award them custody and also filed a return to the petition for writ of habeas corpus wherein they alleged that petitioner was not entitled to Marian's custody because he is an unfit parent. The issues were consolidated for hearing. The trial judge denied the respondents' motion for custody, granted the writ of habeas corpus and modified the divorce decree to award petitioner custody. The order provided that the

respondents have visitation privileges 1 weekend every 2 months and 5 days at Christmas time.

On appeal, the respondents contend that it was against the manifest weight of the evidence for the court to find (1) petitioner a fit parent, and (2) Marian's best interest and welfare would be served by placing her in petitioner's custody.

On the subject of petitioner's fitness, nine witnesses (eight related to the respondent, Mrs. Ferdinardo) testified to alleged incidents of petitioner's having abused Marian during the time of his marriage to Roberta. Six of the witnesses gave virtually verbatim testimony regarding separate occurrences of petitioner having force-fed the baby, Marian. Three of the relatives testified to seeing petitioner spank or "beat" Marian in anger. There was testimony that petitioner referred to Marian on occasion as "Roberta's love child." (We note that although all such incidents were said to have occurred during his marriage to Roberta, the divorce decree found petitioner a fit and proper parent.)

During an interview with the trial judge, Marian at times said that petitioner had hit her and, at other times, said she did not remember him having hit her. The judge stated that he viewed the interview as inconclusive with respect to the question of custody.

A psychiatrist who had interviewed Marian for one-half hour and had a 5-minute discussion with the respondents, testified on the latters' behalf recommending that Marian stay with respondents. He conceded, however, that if he did not believe petitioner had beaten Marian, and if Marian liked petitioner, he would recommend the child be placed in petitioner's custody.

The petitioner denied all incidents of force-feeding, name-calling and beating. He introduced evidence of his personal fitness through his own testimony, and that of his mother, wife and two former neighbors. Witnesses testified that while he lived with both girls, he treated them lovingly, that he was a good father to Dawn who continued to live with him after her parents' separation, and that he could adequately provide for Marian.

Testimony adduced at trial with respect to the best interest of Marian reveals that both petitioner and respondents could provide adequate and proper environments for her and that both parties are fit and proper to have custody. Respondents, who live in a well-kept, middle-class home with Mrs. Ferdinardo's two daughters, had four witnesses testify to their character and to their affection for Marian. Petitioner is remarried, his wife has no children, and the couple live in a six-room, four-bedroom farm house with Marian's half-sister, Dawn.

■■ In determining the question of custody, it is not the fitness of a parent but "the best interest of the child" that is the controlling standard. (*People ex rel. Edwards v. Livingston*, 42 Ill.2d 201, 209 (1969).) In *Edwards*, the supreme court, reversing the trial court, awarded custody of the 12-year-old boy to his grandfather rather than to the boy's natural father, despite the fact that both the father and grandfather were found fit to have custody. The facts revealed, however, that during the 9 years that the boy had lived with his grandfather, the natural father, who lived only 30 miles away, had made no attempt to see his son, had not communicated with him except for one Christmas card and, for all practical purposes, was a stranger to the boy. The father had assumed no parental responsibilities and made no contribution to the child's education or welfare. He, with weekly earnings of $80-$90, had remarried to a woman with five children and the family (of nine) shared a four-bedroom house. Evidence clearly showed that the grandfather had demonstrated a superior ability to provide a loving home for the boy and that during the course of the 9 years, a father-son relationship had been established between the grandfather and the boy. It must be noted that, even under these circumstances, the grandfather was awarded only temporary custody, and the court directed that the father be given liberal visitation privileges in order that affection and understanding could develop between the father and son.

The sole similarity which the instant case shares with *Edwards* is that here, too, we have determined that both parties are fit and proper to have custody. The remaining facts differ significantly. Here, testimony indicates that after Roberta left, taking Marian with her, petitioner, although living 200 miles away, made at least two dozen attempts to see Marian, saw her twice, wrote letters and sent presents. It is clear that he did not abandon her. Dissimilar also were the facts that Marian had lived with her grandparents for only 2 years at the time of the trial court's judgment, that petitioner's second wife has no children and the couple live in a six-room, four-bedroom farm house with Marian's half-sister, Dawn.

■■■ It is recognized that a natural parent has a superior right to custody of the child so long as it is in accord with the best interest of the child. (*Osman v. Osman*, 130 Ill.App.2d 830, 834 (1970).) This superior right of a parent to custody is based partially on the notion that the child's welfare is usually promoted by living in a home where there exists a parent-child relationship. (*Middlecoff v. Leofanti*, 133 Ill. App.2d 822, 826 (1971).) Although these cases specifically concern rights of natural parents, the instant distinction of petitioner being an adoptive

parent does not negate the relevance of the rule of law. The fact that petitioner willingly adopted Marian manifested his intent to have and maintain a parent-child relationship with Marian.

The trial judge as the trier of fact is in a position superior to that of the court of review to observe the demeanor of witnesses and determine their credibility, especially when, as here, the testimony is contradictory. (*Schulenburg v. Signatrol, Inc.*, 37 Ill.2d 352, 356 (1967); *Brown v. Zimmerman*, 18 Ill.2d 94, 102 (1959).) It is a long-standing axiom that the findings of a trial judge will not be disturbed unless against the manifest weight of the evidence. *Shores v. Shores*, 119 Ill.App.2d 85, 88 (1970).

The judge's evaluation of testimony concerning petitioner's abuse of Marian was that it was apparent to him that the relatives had "chosen up sides" over the question of custody and he was struck by the similarities in the testimony of respondents' witnesses, particularly by the reoccurrence of the same words and phrases from different witnesses describing separate incidents of alleged abuse.

■■ The judge's decision in awarding petitioner custody of Marian promotes the integrity of the family unit and Marian's best interest. Not only is Marian to be reunited with her father; she will also be living with her sister and her step-mother, who expressed enthusiasm for having Marian live with them.

It is evident that the trial judge attempted to effect a solution that would inure to Marian's best interest. The judge awarded permanent custody to petitioner but made specific provisions in the order for the respondents to have visitation privileges. His intent was to place Marian in her family unit but allow her to experience the love and affection of her maternal grandparents.

For a judgment to be against the manifest weight of the evidence, it is not enough to show that there is sufficient evidence to support a contrary judgment. The evidence on behalf of the appellant must be so strong and convincing as to completely overcome the evidence and presumptions, if any, existing in favor of the appellee. *People ex rel. Louth v. Wilmington Coal Co.*, 402 Ill. 161, 167 (1949); *Broncata v. Timbercrest Estates, Inc.*, 100 Ill.App. 49, 54-55 (1968).

■■ We find that the manifest weight of the evidence supports the trial court's ruling that Marian's welfare would be best served by giving petitioner permanent custody and granting visitation rights to the grandparents.

Judgment affirmed.

GUILD, J., concurs.

Mr. JUSTICE RECHENMACHER, dissenting:

I must dissent.

The resolution of a custody dispute is without doubt among the most difficult of all matters which come before the courts. I recognize that in reviewing the judgment of a trial court we must give due weight and consideration to the fact that the trial court had the opportunity of observing and evaluating the witnesses. However, in this case, a review of the testimony convinces me that the award of Marian's custody to the appellee was contrary to the weight of the evidence and was not in the girl's best interest. The appellee and his adopted daughter, Marian, were never close and appellee's wife is an absolute stranger to the girl. In fact, at the time of the hearing she had been married to appellee only 2 weeks, had never had any children of her own, had never seen Marian prior to the hearing, and appellee testified that the plan was for her (appellee's present wife) to take over the care of his natural child, Dawn, as well as Marian.

The best interest of the child is the standard, and it is not necessary that the natural parent be found unfit or be found to have legally forfeited his right to custody if it is in the best interest of the child that he or she be placed in the custody of someone other than the natural parent. (See *Giacopelli v. The Florence Crittenton Home* (1959), 16 Ill.2d 556.) If this standard applies to a natural parent it certainly should apply to the appellee who is an adoptive parent.

The child has been living with and in the home of the maternal grandparents since August of 1970. She went there first with her mother, after her mother and the appellee separated, and she remained with the maternal grandparents after the mother was killed in June of 1972.

It is undisputed that the child is well-adjusted and happy in the grandparents' home. Also, it is undisputed that the grandparents are fit and proper persons to have the custody of a child; there is no testimony whatever to the contrary. There is considerable testimony to the effect that the appellee beat the child and that the child fears him. There is also testimony by Dr. Kesert, a neurological psychiatrist, that he examined Marian Lutz and that in his opinion the child was happy in the home of the appellants (grandparents), that she was afraid of the appellee, and that it would be very traumatic psychologically for her to be taken from the home of the grandparents at this time. Considering all of these circumstances I am of the opinion that it was against the manifest weight of the evidence and was not in keeping with the child's best interest to remove her from a happy, stable and wholesome environment for the apparent primary purpose of placing her with her adoptive (not natural) father. I would reverse the judgment of the trial court.