*In re J.J. et al.*, Minors and Respondents-Appellees (The People of the State of Illinois, Petitioner-Appellee, v. L.W., Respondent-Appellant).

First District (2nd Division)    No. 1—00—1501

Opinion filed December 24, 2001.

Kwame Raoul, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Jennifer

Streeter, and Kathleen C. Johnsos, Assistant State's Attorneys, of counsel), for the People.

Patrick T. Murphy, Public Guardian, of Chicago (Charles P. Golbert and Kristin Wuerffel, of counsel), guardian *ad litem*.

JUSTICE McBRIDE delivered the opinion of the court:

Following a hearing on a petition by the Department of Children and Family Services (DCFS) to appoint a guardian of the person of the minors and its motion to vacate DCFS' guardianships, terminate wardships and close the minors' cases, the trial court granted the petition and the motion, finding that the best interests of J.J. and T.R. would be served by private guardianships with their maternal aunt. Respondent L.W., the children's mother, contends that the court's determination was against the manifest weight of the evidence.

The evidence in the record shows that J.J. was born on May 4, 1989, and T.R. was born on November 17, 1995. On March 19, 1997, petitions for adjudication of wardship were filed alleging that they were neglected based on their injurious environment and that T.R. was additionally neglected due to lack of care. At a temporary custody hearing held the following day, the evidence established that on March 14, 1997, T.R. swallowed several prescription antidepressant pills and became comatose. L.W. attempted to treat T.R. with a spoonful of castor oil and then put her to bed with a bottle of milk. She did not call an ambulance until three hours later when T.R. had difficulty breathing. T.R. remained in a coma for 22 days.

The parties stipulated to prior incidents where L.W.'s negligence or passivity caused her children to be injured. On June 28, 1993, J.J. was permanently injured when he shot himself in the face with a handgun found on respondent's living room floor. As a result, J.J. was blinded in one eye, was brain damaged and paralyzed on one side of his body. Previously, on January 8, 1991, another child of L.W., 2½-month-old J.W., died from shaken baby syndrome after being abused by her biological father.

At the conclusion of the hearing, the court found probable cause to believe that both children were neglected and that it was a matter of urgent and immediate necessity that they be removed from the custody of their parents. DCFS placed the children with their maternal aunt and uncle as foster parents.

A psychological examination of L.W. was ordered at the March 20, 1997, hearing. The examination rated her IQ at 67, placing her at the first percentile as compared to others in her age range. Tests revealed that her verbal, comprehension, perceptual, organizational, fine-motor

and visual-motor abilities were deficient. Her academic skills were rated at a low to middle elementary school level. The report concluded: "[L.W.] should not be assuming primary care of her children, as she does not have the intellectual or personality resources to be an effective caretaker. It is advised that another close family member, relative or friend assume this job. By placing [L.W.] in a position of responsibility and/or authority, the children's safety and well-being remain at risk."

On December 18, 1997, following an adjudicatory hearing, the court found J.J. and T.R. neglected due to lack of care, an injurious environment, and substantial risk of physical injury. Following a dispositional hearing on January 30, 1998, the court found L.W. unable to care for, protect, train or discipline the children, and ordered that the children be made wards of the court, making DCFS guardian with the right to place them.

On May 18, 1998, the court entered a permanency order having the goal of returning the children home pending a status hearing. On April 16, 1999, following a permanency hearing, the court entered a permanency order modifying the goal to private guardianship. In August 1999, DCFS filed motions to vacate the children's guardianships, terminate their wardships and close their cases, and requested subsidized private guardianship for the children with their maternal aunt and uncle. The motions stated that the two children had been living with their aunt and uncle for more than two years and had a strong, mutual attachment to them. The motions also noted that efforts to reunite the children with L.W. had failed because she had not cooperated with the services provided for her.

On December 6, 1999, L.W. filed a motion for the appointment of a court-appointed special advocate (CASA) and for a parenting assessment report.

In a January 1999 report, L.W.'s therapist, Edward Landreth, stated that he had terminated therapy because she "could not grasp the concept of psychotherapy nor productively benefit from it," but instead became defensive and accused DCFS of causing all of her problems. He recommended that the children not be returned to L.W. because she did not accept responsibility for her past inadequate care of the children and had not developed a plan for supervising them in the future.

On January 12, 2000, the court held a hearing on the pending motions, stating that it would first hear the motions filed by DCFS because they had been filed months prior to L.W.'s motion.

Wister Coleman testified that he had been the DCFS caseworker for J.J. and T.R. since the time that they were removed from L.W.'s

home in March 1997. In addition to many of the facts already stated above, Coleman testified that although L.W. complied with all the services requested of her by DCFS, she did not meet any of the requirements of the services. He stated that in September 1999, the permanency goal for J.J. and T.R. was changed from returning them to their home to private guardianship because several reports and evaluations of L.W. demonstrated that she did not have the intellectual or personality resources to be an effective caretaker. Coleman believed that respondent had no understanding of child development and was incapable of parenting. After holding a meeting to determine whether a "safety plan" could be established to allow the children to return home, he had determined such a plan was inappropriate because he received no commitment from L.W.'s parents or church.

Coleman also testified that the children's maternal aunt and uncle, Darlene and Kenneth Blanks, had bonded with the children, loved them and were willing to become their guardians. They were both adept at caring for J.J.'s special needs which resulted from the shooting. Coleman stated the Blanks told him that on many occasions respondent had behaved inappropriately while visiting the children by attempting to take the children away from their home, and when the Blanks stopped her, she became verbally aggressive with them and the children. They described respondent's visits as disruptive and unbearable. Coleman testified that although the children generally enjoyed visiting with respondent, they had become disgusted and upset with the fact that respondent continued to disrupt their home and create emotional problems for them. Coleman stated that during a clinical staffing, respondent had made ominous and threatening gestures toward him and an administrator, thereby terminating the meeting. Coleman testified that Darlene Blanks told him that despite respondent's behavior, she believed that they would be able to structure a visitation plan for her. In Coleman's opinion, appointing Kenneth and Darlene Blanks as guardians of the children was in the children's best interests.

Edward Landreth testified that he had provided therapy to respondent between July and November 1998. At the time that he was treating her, he was completing his doctoral internship and had been working under the supervision of a senior doctor at Interaction Dynamics for 19 months. Landreth had a bachelor's degree in general psychology, a master's degree in clinical psychology, and a master's degree in clinical social work. He had been employed in the field of psychology since 1990.

Landreth's therapy goals for respondent included establishing a therapeutic relationship, increasing her decision-making skills and

coping abilities, dealing with separation from her children, and helping her understand and take responsibility for her role in the injuries to her three children. Landreth found that respondent's cognitive ability was very low. Additionally, she suffered from a long-term, persistent depression (which he termed "dysthymic" disorder), and her cognitive limitations seemed to prevent her from coping with her problems or from thinking in abstract terms. After 17 therapy sessions, respondent made such little progress in achieving her necessary goals that Landreth terminated the sessions. Landreth advised the court that respondent had also made little progress when she attended 20 sessions with a prior therapist, Miko Anderson. Landreth stated that he believed that respondent should not regain custody of the children because she was not capable of protecting and monitoring them, could not predict or anticipate danger, and had difficulty making decisions or plans.

When Landreth was asked his opinion of evaluations prepared in September 1999 and February 2000 by Maisha Hamilton-Bennett from Hamilton Wholistic Healthcare, Ltd., which recommended that the children be returned to respondent, he responded that he was concerned about the reports because the first report was based on only two sessions with respondent, and the second on only seven sessions. He did not believe that the results of Hamilton-Bennett's psychological tests were accurate because they were dramatically improved over the results respondent received in 1997 from similar tests administered by Great Lakes Services. He stated that during his counseling sessions with respondent, he found her behavior to be consistent with the 1997 test results. Additionally, Hamilton-Bennett's recommendations were based only upon information provided by respondent and the fact that respondent attended church. Landreth believed that although respondent's relationship with her pastor may help her emotionally, it alone would not help her cognitive abilities or improve her coping, planning and decision-making skills.

On cross-examination, Landreth admitted that although the prior therapist requested psychological testing for respondent, Interaction Dynamics never tested her and that such testing would have been helpful in his diagnosis of respondent. He also admitted that he made his recommendations regarding placement of the children without observing respondent interact with them. In fact, he never observed her interact with anyone. Landreth testified that dysthymic disorder is generally treated with individual psychotherapy, and although there could be medical intervention, such intervention was more common with other types of depression. He was unaware of whether a psychiatric evaluation was ever prepared regarding respondent and admitted

that such an evaluation might have shown that she was eligible for medical treatment. Landreth admitted that he did not establish a therapeutic relationship with respondent and that she might have progressed better if she had been referred to a different therapist.

On redirect examination, Landreth stated that neither a good relationship with her therapist nor medication would improve respondent's cognitive ability. He also stated that although there was always a possibility that respondent could at some time parent her children, it was more likely that, at the time of the hearing, respondent still did not have the capability to make decisions that would protect her children from danger.

Lashanda Shaw testified in respondent's behalf that she was respondent's daughter-in-law and had resided with her "off and on" from 1993 through 1996. Respondent behaved appropriately with children, kept a clean house and did not leave medications or guns within the reach of children. Respondent took proper care of Shaw's children while Shaw was at work.

Respondent testified that although she kept her appointments with Landreth, he made her feel uncomfortable because he told her that he could not help her, that she needed an attorney, and that DCFS wanted to take her children. After Landreth terminated her therapy, she began counseling with her church pastor and continued the counseling every Tuesday for seven months.

Pamela Johnson, a public school nurse who had received CASA training, testified that in the summer of 1999 she met respondent in church. After reviewing respondent's case file, she referred respondent to Dr. Hamilton-Bennett in order to help her regain custody of her children. Johnson accompanied respondent to at least three visits with J.J. and T.R. at the Blanks' home. Each time, Darlene Blanks yelled at respondent and the children and, at one visit, announced that respondent would no longer be allowed to visit the children. She also threatened to call DCFS regarding J.J. and told respondent that she would never see her children again. Mrs. Blanks also objected to respondent's involvement with her church. On cross-examination, Johnson admitted that not only was she no longer a volunteer for CASA, her supervisor had terminated her from the program because of her inappropriate behavior regarding respondent's case. She admitted that she was not testifying in any official capacity, but only as a friend.

In rebuttal, Darlene Blanks denied that she threatened to call DCFS regarding J.J. or that she complained about respondent's involvement with the church.

At the conclusion of the hearing, the trial court found that based

on all of the evidence, especially the three incidents in which her children were previously harmed and one killed, the protection of the children required that the primary caretaker be their private guardian Darlene Blanks. The court stated that "the best interest of the children here would best [be] served by private guardianship with their maternal aunt." The court specifically explained that its order did not terminate respondent's parental rights and that she retained the ability to visit with her children and be involved in their lives.

On appeal, respondent contends that the trial court's determination to close her case and appoint her sister as the children's private guardian was against the manifest weight of the evidence.

Initially, we note that respondent mistakenly asserts that the facts in her case required the trial court to presume that her rights to the care, custody and control of her children were superior to the claims of any other person or entity. In support of her assertion, she cites *In re Custody of Peterson*, 112 Ill. 2d 48, 51 (1986), and *In re Estate of Webb*, 286 Ill. App. 3d 99, 101 (1996). However, both of these cases pertained to custody disputes between private parties and did not involve placement with relatives due to adjudicated findings of abuse or neglect by the children's parents. Accordingly, we find that neither case is applicable here.

█ Pursuant to the Juvenile Court Act of 1987 (Act), in order to deprive a parent of custodial rights to children who have been adjudged wards of the court, a court must find that the parent is unfit or unable to care for, protect, train or discipline the children or is unwilling to do so. 705 ILCS 405/2—27 (West 1998). Where child custody proceedings are brought under the Act, the juvenile court's primary concern is the best interests of the child, and to that end, the court is vested with wide discretion. *In re Stilley*, 66 Ill. 2d 515, 520 (1977); *In re M.V.*, 303 Ill. App. 3d 190, 195 (1999). In such custody proceedings, a child's best interest is superior to all other factors, including the interests of the biological parents. *In re Ashley K.*, 212 Ill. App. 3d 849, 878-79 (1991). "If the 'best interests' standard can be attained only by placing the child in the custody of someone other than the natural parent, it is unnecessary for the court to find the natural parent unfit to care for the child." *In re J.F.K.*, 174 Ill. App. 3d 732, 734 (1988); *People ex rel. Edwards v. Livingston*, 42 Ill. 2d 201 (1969). A court of review will not disturb a trial court's determination in a child custody case unless the court exceeded its broad discretion or unless its determination is against the manifest weight of the evidence. *In re M.V.*, 303 Ill. App. 3d at 195. A judgment is against the manifest weight of the evidence only when an opposite conclusion is clearly apparent. *In re C.N.*, 196 Ill. 2d 181, 208 (2001).

In support of her argument, respondent directs our attention to the evidence showing that she complied with all services and tasks recommended by DCFS, successfully completed parenting classes where she was given a rating of four on a five-point scale, and complied with drug and alcohol assessments and random urine screens which all produced negative results. She contends that these factors demonstrated that she had sufficient cognitive ability to form a strong understanding of parenting skills. She also notes that her caseworker acknowledged that a bond existed between her and the children and that the trial court agreed with the caseworker's determination.

Although it appears true that respondent complied with the various services and tasks assigned by DCFS, we do not agree with her contention that such compliance demonstrated sufficient cognitive ability to parent her children. In fact, Landreth testified that although respondent appeared for every appointment, he had to terminate his therapy sessions with her because she lacked the cognitive ability to benefit from them. Further, with respect to respondent's receiving a four-out-of-five rating in her parenting class, Wister Coleman testified that the rating was given for her overall participation and attendance, not her ability to parent. With respect to her assertion that her maternal bond with her children was alone sufficient to demonstrate that she was capable of parenting them, we find that respondent has provided no authority to support her assertion.

Respondent next asserts that in rendering its decision, the trial court improperly considered the shaken-baby death which occurred in 1991 and J.J.'s gunshot injuries in 1993 because after both incidents, DCFS never found respondent unfit or removed any children from her custody. However, respondent again cites no authority to support her assertion. Additionally, we find that the trial court was correct in determining that evidence of the past incidents was relevant to show that she lacked the cognitive ability to anticipate dangerous situations or to protect her children.

Respondent contends that she acted properly when she gave T.R. castor oil and a bottle of milk after T.R. ingested the medication which led to her coma, and then three hours later called for emergency help. However, other than this general statement of her innocence, she provides no authority in support of her argument, and we find it to be without merit.

She next contends that the court improperly relied on the testimony of Edward Landreth, who had no prior experience in evaluating or counseling caregivers in child protective matters and had not yet earned a doctorate in psychology. Respondent further asserts that Landreth's opinions were not worthy of the court's

consideration because he never observed her interact with her children or considered her ability to function in the workplace, where she performed as an "exemplary employee" as described by an employer. Additionally, Landreth's agency never conducted psychological tests on her although he admitted that such tests were requested by his predecessor and would have assisted Landreth in his diagnosis of respondent. Further, although Landreth diagnosed her as suffering from a depressive condition that could be readily treated by medication or psychotherapy, he testified that he was not aware of whether respondent was ever psychiatrically evaluated for medical treatment. Finally, she directs our attention to Landreth's admission that he never gained her trust during therapy sessions and that she might have progressed better had she been referred to another therapist whom she could trust.

Initially, we note that the State contends that respondent has not preserved this matter for review because she never objected to Landreth's expert testimony at the hearing. Although we find that we need not address this issue (*People v. Macri*, 185 Ill. 2d 1, 43 (1998)), we find her contention without merit.

In *People v. Miller*, 173 Ill. 2d 167, 186 (1996), the supreme court discussed the applicable law regarding expert witnesses, stating:

"Whether an individual is an expert on a particular subject is a matter generally reserved to the sound discretion of the trial court. [Citation.] An individual will be allowed to testify as an expert if his experience and qualifications afford him knowledge which is not common to laypersons, and where such testimony will aid the trier of fact in reaching its conclusions. [Citation.] An expert need only have knowledge and experience beyond that of the average citizen. [Citation.] There is no predetermined formula for how an expert acquires specialized knowledge or experience and the expert can gain such through practical experience, scientific study, education, training or research."

The credibility of the expert and the weight to be given his opinion are matters to be decided by the trier of fact in light of the expert's credentials and the basis for the expert's opinion. *In re L.M.*, 205 Ill. App. 3d 497, 512 (1990). A trial court is not required to accept the opinion of an expert when the court renders its ultimate determination. *In re R.M.*, 307 Ill. App. 3d 541, 551 (1999).

Here, the record shows that Landreth had a bachelor's degree in general psychology, master's degrees in clinical psychology and clinical social work, and was completing work for his doctorate in clinical psychology when he treated respondent. We find that the trial court did not err in determining that his education alone qualified him as an

expert in psychology. Further, he had been employed in the field of psychology for seven years prior to meeting respondent.

Respondent asserts that before Landreth made his recommendations, he should have conducted more psychological testing, should have observed her with her children and at her workplace, should have had her evaluated for medical testing to determine if medication could have corrected her depressive disorder, and should have referred her to another therapist when respondent was not progressing with him. We find that respondent's assertions are unsupported by the record or any cited authority, and consist of mere supposition and conjecture. Further, Landreth's testimony and recommendations were fully corroborated by respondent's caseworker Wister Coleman, who had worked with respondent since the time that the children were removed from their home in March 1997.

Accordingly, we find that the trial court did not err in determining that the best interests of J.J. and T.R. required that they be placed in the care of their maternal aunt and her husband in the form of a private guardianship.

For these reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

CAHILL and GORDON, JJ., concur.